[No. 17808-7-II.   Division Two.   April 19, 1996.]

JOHN DOE, *Appellant*, v. JOHN G. FINCH, *Respondent*.

*David A. Summers*, for appellant.

*Donald E. Murray*; and *Monica J. Fernandez, Robert J. Roche*, and *Bullivant, Houser, Bailey, Pendergrass & Hoffman*, for respondent.

MORGAN, J. — John Doe appeals a summary judgment that dismissed his complaint against Dr. John G. Finch, a psychotherapist. Taking the facts in the light most favorable to Doe,[1] we reverse and remand.

John and Jane Doe were married sometime before 1974. They separated in 1977 and divorced in 1981.

In February 1974, Doe began therapy with Dr. Finch, who was already treating Doe's wife. He continued in therapy until February 4, 1980, except for the period from April 1975 to June 1976.

Doe's therapy centered on problems in his marriage. According to him,

> When I returned to therapy in June of 1976, my spouse and I were continuing to have marital difficulties. The problem in our marriage was the most important issue facing me at the time, and my therapy with Dr. Finch was largely devoted to this issue. I wanted to change my behavior so that the marriage could be saved, and I wanted Dr. Finch's help. I told Dr. Finch that I wanted to change, and that I loved my wife.[2]

In 1976, Dr. Finch and Doe's wife began a sexual relationship. That relationship continued until at least 1981. Thus, for a period of about four years, Dr. Finch was providing marital counseling to Doe while at the same time engaging in sexual relations with Doe's wife.

Although Doe was not informed of this sexual relationship by either his wife or Dr. Finch, he observed that his wife and Dr. Finch seemed exceptionally close. As a result, he states, he inquired of Dr. Finch as follows:

> There were times when I was jealous of Dr. Finch. It

---

[1]*Hansen v. Friend*, 118 Wn.2d 476, 485, 824 P.2d 483 (1992).

[2]Clerk's Papers at 16; *see also* Clerk's Papers at 24.

sometimes seemed that my wife had a higher opinion of him than she did of me, and it sometimes seemed that he occupied a more important place in her life than I did. I even confronted him with my feelings of jealousy. He assured me, more than once, that I had nothing to worry about, and that his relationship with my spouse was strictly professional. He had an explanation for her apparent devotion to him. He told me that he was being a "father figure" to her, to make up for the fathering she never received. Although I sometimes resented the closeness of their relationship—because it seemed like a type of closeness I wanted with my wife but couldn't achieve—I accepted his explanation. I never imagined that he was sexually involved with her. He was a respected Christian psychologist who seemed to stand for the highest moral values. It never occurred to me that while I was pouring my heart out to him about my relationship with my spouse, he was at the same time romantically and sexually involved with her.[3]

Additionally,

I asked Dr. Finch more than once to explain why my spouse seemed more devoted to him than to me, and why he seemed like such a central person in her life. I asked these questions because I was jealous of him.

He never told me what was taking place. Instead, he misled me by telling me that he was serving as a father figure for her, that is, that he was playing the role of the father she "never had." When I expressed my concerns, and tried to learn more about the relationship, he assured me that his relationship with her was entirely professional. He led me to believe that her feelings about him were an outgrowth of her psychological needs, and that his response to her was nothing for me to be concerned about. He led me to believe that he was working to help preserve the marriage.[4]

Although Doe ceased therapy on February 4, 1980, he continued to attend annual conferences sponsored by Dr. Finch. Then, in December 1981, he wrote the following letter to Dr. Finch:

---

[3]Clerk's Papers at 17.

[4]Clerk's Papers at 89; *see also* Clerk's Papers at 26.

The hurt, anger, and bitterness that I feel because of the divorce by [my wife] is choking me to death.

Blame for breakdown of the marriage relationship has always been laid on me—BY BOTH YOU AND HER!! AND THAT is bullshit. Both you and her are also RESPONSIBLE!

AND I HOLD YOU RESPONSIBLE!!

YOU ARE NOT A HEALER—YOU ARE A BREAKER. YOUR CHRISTIAN PSYCHOLOGY SHOWS ME NO EVIDENCE OF BEING HEALING! . . .

. . . .

THE TRUE REASON WHY THERE COULD BE NO RECONCILIATION IS—THAT YOU ESTABLISHED AND NURTURED A RELATIONSHIP. YOU STOLE HER AFFECTION WHICH YOU HAD NO RIGHT TO DO! WHEN SHE TRANSFERRED WIFELY AFFECTION TO YOU—YOU LET IT HAPPEN. YOUR "EXCUSE" WAS TO PROVIDE A LOVING MALE RELATIONAL EXAMPLE FOR HER—TO MAKE UP FOR LACK OF FATHER-LOVE, AND LACK OF MARITAL LOVE. WRONG-WRONG-WRONG.

And it happened under my very nose, before my very eyes. And I was too innocent to be supicious [sic].

. . . .

4. REMEMBER THE INDIAN FREIGHTER PARTY IN THE PORT OF TACOMA? I DO—WITH GREAT PAIN—HOW COULD I HAVE BEEN SO DUMB?

- MY SECRETARY INVITED [my wife] AND I TO THE SHIP. SHE WOULD NOT COME.
- [My wife] SUGGESTED I INVITE YOU. IN MY GULLIBILITY I DID.
- THEN SHE DECIDED TO COME TOO.

THEN WHAT DID SHE DO? HUNG ONTO YOU ALL NIGHT, PARKED AT YOUR SIDE, SITTING BY YOU AT DINNER, SPEAKING TO ME ONLY WHEN SHE HAD TO.

THE CREW OF THE SHIP COULD NOT BE CONVINCED

THAT SHE WAS MY WIFE—THEY KNEW SHE WAS
YOUR WIFE. ME IN MY INNOCENCE—THEY IN THEIR
WISDOM.

WRONG, JOHN—TOTALLY, COMPLETELY WRONG.
YOU FOSTERED THE RELATIONSHIP—YOU ENCOUR-
AGED IT. YOU HAVE WRONGED OUR WHOLE FAM-
ILY!!

. . . .

6. MY INTENSIVE FOR FREE! BIG FUCKING DEAL--
NOTHING BUT A SALVE FOR YOUR CONCIENCE [sic]--
NOTHING MORE. YOU KNEW--YOU KNEW--YOU
KNEW. AND THEN YOU SUPPORTED MY DECISION TO
RETURN HOME--WHAT HOME? YOU HAD ALREADY
STOLEN IT!! YOU DIRTY, YELLOW ROTTEN HYPO-
CRITE!!! . . . [5]

Doe now says that he wrote this letter to vent his anger
about what he thought was a close emotional relationship
between his wife and Dr. Finch. He says he did not know
that his wife and Dr. Finch were engaged in a sexual rela-
tionship, and that he still believed Finch's assertions that
their relationship was "strictly professional." Doe states:

All I knew in 1981 was that my spouse and I had spent ap-
proximately five years in therapy with Dr. Finch; that I had
worked diligently with him to change my behavior to save
the marriage; that the marriage had failed; and that my
spouse seemed far more devoted to Dr. Finch than to me. I
was very jealous and very bitter. Because I felt I had worked
so hard to change — all for naught — I wanted to blame
someone else. I found myself, at least for a while, blaming Dr.
Finch, and feeling that he was unethical. However, I had no
evidence of any misconduct or unethical behavior by him.
. . .[6]

During the remainder of the 1980's, neither Doe's wife
nor Dr. Finch disclosed to Doe that they had maintained a

---

[5]Clerk's Papers at 66-68 (emphasis in original).

[6]Clerk's Papers at 87.

sexual relationship between 1976 and 1980. Then, in April 1991, Dr. Finch sent a letter stating that he had engaged in a "long-standing intimate relationship" with a former patient (not Doe's wife), and that he had settled a lawsuit brought by that patient.[7]

After Doe received this letter, according to him, he began to reassess his earlier acceptance of Dr. Finch's statements that the close relationship between Dr. Finch and Doe's wife had been strictly professional. Hence, on May 7, 1991, he wrote a letter to his ex-wife in which he stated:

> I am aware of all the information about John Finch's conduct with certain female clients which is now surfacing. I had strongly felt that his emotional involvement with you was highly unethical and now I realize that his involvement was also sexual. . . .[8]

On April 27, 1992, Seattle newspapers reported, in front page articles, that six of Dr. Finch's former patients were alleging that he had engaged in sexual improprieties while treating them. The next day, Doe received a phone call from his ex-wife in which she "frankly admitted that she too had been sexually involved" with Dr. Finch.[9]

On October 16, 1992, Doe filed this suit. In his complaint, he alleged that Dr. Finch had "entered into a sexual and romantic relationship with the plaintiff's spouse;"[10] that this relationship "was on-going while the plaintiff was defendant's psychotherapy client;"[11] and that he, Doe, was unaware of this relationship while he was Dr. Finch's client. He asserted the alleged facts would support claims for

---

[7]Clerk's Papers at 91. Doe also notes that in August 1990 he had heard a rumor that Dr. Finch "had engaged in improprieties" with female patients. Clerk's Papers at 88..

[8]Clerk's Papers at 65.

[9]Clerk's Papers at 18-19. In July 1992, Dr. Finch's license to practice was revoked.

[10]Clerk's Papers at 106.

[11]Clerk's Papers at 106.

"malpractice" and "outrage."[12] Later, on appeal, he stated that "[t]he presence of a fiduciary duty is an essential element" of his claims.[13]

In 1993, Doe filed a motion for summary judgment on the issue of liability. Dr. Finch filed a cross-motion for dismissal based on failure to comply with the statute of limitations. The trial court ruled that Doe had failed to comply with the statute of limitations "in view of the [December 1981] letter."[14] The trial court entered a summary judgment of dismissal, and Doe filed this appeal.

Preliminarily, this is not a suit by one spouse against the other, alleging extramarital activity.[15] Nor is it a suit by one spouse against a third party, alleging alienation of the other spouse's affections.[16] Nor is it a suit by one spouse against a therapist, alleging breach of a professional duty owed solely to the *other* spouse.[17] Rather, it is a suit by one spouse against a therapist, alleging breach of a professional duty owed by the therapist to the *suing* spouse. The only question on appeal is whether the statute of limitations bars recovery as a matter of law.

RCW 4.16.350 provides that when a patient desires to sue a psychologist or other health care provider for professional negligence, the action

> shall be commenced within three years of the act or omission alleged to have caused the injury or condition, or one year of the time the patient or his representative discovered or reasonably should have discovered that the injury or condition was caused by said act or omission, whichever period expires later, except that in no event shall an action be commenced more than eight years after said act or omission: PROVIDED,

---

[12]Clerk's Papers at 107.

[13]Br. of Appellant at 9. The trial court did not address whether the alleged facts are sufficient to state a cause of action. Nor do we.

[14]Report of Proceedings (Nov. 19, 1993) at 18.

[15]*See In re J.T.*, 77 Wn. App. 361, 891 P.2d 729 (1995).

[16]*See Wyman v. Wallace*, 94 Wn.2d 99, 615 P.2d 452 (1980).

[17]*See Lund v. Caple*, 100 Wn.2d 739, 675 P.2d 226 (1984).

That the time for commencement of an action is tolled upon proof of fraud, intentional concealment, or the presence of a foreign body not intended to have a therapeutic or diagnostic purpose or effect.

This statute creates limitation periods of three, one, and eight years. According to the Supreme Court, none of these periods commences while the patient is subject to a legal disability.[18] Similarly, according to the plain terms of the statute, none of these periods commences while a health care provider is engaging in fraud or intentional concealment, or while a nontherapeutic, nondiagnostic foreign object is present in the plaintiff's body. Once time starts running, assuming no intervening disability, fraud, or intentional concealment, the patient must sue within three years of the provider's act or omission, or within one year after the patient discovers (or a reasonable person would have discovered) facts constituting each element of the cause of action.[19] The dominant period is whichever one expires later, but the one year rule cannot extend the three year rule by more than an additional five years (making a total of eight years).

To apply this statute here, we address two questions. The first is whether a jury could find that Dr. Finch intentionally concealed the fact that he was engaging in a sexual relationship with Doe's wife, while at the same time providing marriage counseling to Doe. The second question is whether a jury could find that the intentional concealment ended less than three years before October

---

[18]*Gilbert v. Sacred Heart Medical Ctr.*, 127 Wn.2d 370, 900 P.2d 552 (1995); *see also Merrigan v. Epstein*, 112 Wn.2d 709, 773 P.2d 78 (1989); RCW 4.16.190.

[19]*In re Estates of Hibbard*, 118 Wn.2d 737, 752, 826 P.2d 690 (1992); *Allen v. State*, 118 Wn.2d 753, 758-59, 826 P.2d 200 (1992); *Ohler v. Tacoma General Hosp.*, 92 Wn.2d 507, 511, 598 P.2d 1358 (1979); *Olson v. Siverling*, 52 Wn. App. 221, 228, 758 P.2d 991 (1988), *review denied*, 111 Wn.2d 1033 (1989); *Wood v. Gibbons*, 38 Wn. App. 343, 348-49, 685 P.2d 619, *review denied*, 103 Wn.2d 1009 (1984).

16, 1992.[20] If we answer yes to both questions, RCW 4.16.350 does not bar this suit as a matter of law.

We answer yes to the first question. Doe says he "asked Dr. Finch more than once to explain why my spouse seemed more devoted to him than to me, and why he seemed like such a central person in her life." He then says that Dr. Finch "misled" him by stating "that he was serving as a father figure for her;" "that his relationship with her was entirely professional," and that "he was working to help preserve the marriage."[21] Rather than denying these assertions, Dr. Finch says it is "possible" that he told Doe he was acting as a father figure for Doe's wife.[22] Based on this evidence, a jury could reasonably find that Doe asked Finch about the relationship between Finch and Doe's wife; that Finch responded with lies; and that Finch was intentionally concealing a sexual relationship with Doe's wife.

We also answer yes to the second question. Doe says that he believed Dr. Finch's statements until at least April 1991, when he received Dr. Finch's letter admitting sexual relations with another former patient. As far as the record shows, Dr. Finch did nothing to correct his lies, or to otherwise abrogate their effect, until he sent the April 1991 letter. A jury could infer that intentional concealment continued to April 1991; that Doe sued within three years of that date; and that Doe has complied with the three year statute of limitations.

Attempting to avoid this conclusion, Dr. Finch argues that the effects of his intentional concealment, if any, necessarily terminated on February 4, 1980, the date on which his and Doe's treatment relationship ended. We

---

[20]The one year discovery rule is immaterial to this case. When Doe wrote his May 7, 1991, letter to his ex-wife, he knew that she and Dr. Finch had had a sexual relationship. He did not sue within one year of that time. Accordingly, a jury could not reasonably find that he sued within one year of when he had knowledge of Dr. Finch's breach of professional duty.

[21]Clerk's Papers at 89.

[22]Clerk's Papers at 26.

disagree. Although a breach of professional duty generally must occur before the professional relationship ends,[23] the intentional concealment of a breach can continue after the relationship has ended.

Dr. Finch relies on *Quinn v. Connelly*,[24] but that case is distinguishable on a number of grounds. First, the *Quinn* court was not discussing the statute in issue here. It was concerned with the breach of an attorney-client relationship, and RCW 4.16.350 does not apply to such relationships.

Second, the *Quinn* court was not discussing the question presented here. RCW 4.16.350 draws a distinction between, and assigns different effects to, a professional's conduct (e.g., fraud or intentional concealment) and a recipient's state of mind (e.g., knowledge). According to the statute, a health care professional who engages in fraud or intentional concealment tolls the three year, one year and eight year statutory periods. In contrast, a recipient who discovers the facts needed to support a claim triggers the one year discovery rule, which may or may not dominate over the three year rule. The *Quinn* court was not discussing the professional's conduct, which is the question involved here; rather, it was discussing the recipient's state of mind.

Finally, *Quinn*'s facts distinguish it from this case. In *Quinn*, the client was present in open court, observed the acts of his attorney, then later wanted to claim he lacked knowledge of such acts. Obviously, he had knowledge, and the court so held as a matter of law. In this case, Doe did not observe the sexual conduct between his wife and Dr. Finch. Hence, reasonable minds could differ on whether he had knowledge and, if he did, on when such knowledge was acquired.

Dr. Finch argues that Doe's December 1981 letter demonstrates conclusively that Doe had knowledge at that

---

[23]*Doyle v. Planned Parenthood of Seattle-King County, Inc.*, 31 Wn. App. 126, 129, 639 P.2d 240 (1982).

[24]63 Wn. App. 733, 741, 821 P.2d 1256, *review denied*, 118 Wn.2d 1028 (1992).

time and that there was no intentional concealment at that time. Thus, he says, the three, one and eight year periods had all commenced to run by that time.

Doe responds that he wrote the December 1981 letter merely to express his anger about the relationship between his wife and Dr. Finch, and that he did not then know their relationship was more than therapeutic. He supports his assertion with the affidavit of J. Robert Wheeler, Ph.D., who states:

> [B]ased on my clinical experience and on the professional literature, it is not unusual for a psychotherapy patient to express strong feelings of anger toward the therapist, while at the same time continuing to trust and respect the therapist, and to be dependent on the therapist. These seemingly contradictory emotions arise out of the therapeutic relationship, and from some therapeutic perspectives are even essential to the healing process. . . .
>
> The fact that John Doe's spouse may have shown a devotion to Dr. Finch is no reason to suspect that a sexual relationship existed. It is well known that patients commonly become infatuated with their therapists. It is common for a psychotherapy patient to "fall in love with" the therapist, or to idolize the therapist. Such feelings arise out of a process typically referred to as "transference." Although some therapists abuse the transference process, and take advantage of the patient's feelings by becoming sexually involved with them, the mere fact of devotion or attachment, alone, is no reason to suspect a sexual relationship.[25]

In our view, a reasonable jury could either accept or reject this explanation of the December 1981 letter. A jury could find the letter immaterial for the reasons Doe asserts; or, it could consider the letter as evidence of the fact that by December 1981 Dr. Finch's alleged lies were no longer effective in concealing his sexual conduct with Doe's wife. The letter poses questions of fact, and it does not support the trial court's grant of summary judgment.

---

[25]Clerk's Papers at 93-94; *see Heinmiller v. Department of Health*, 127 Wn.2d 595, 597-98, 903 P.2d 433 (1995), *amended*, 909 P.2d 1294 (1996).

In summary, the statute of limitations cannot be applied as a matter of law. Rather, it can be applied (or not applied) only after a jury decides whether Dr. Finch engaged in intentional concealment and, if so, until when. The trial court erred by granting summary judgment.

Reversed and remanded for further proceedings.

HOUGHTON, A.C.J., and FLEISHER, J. Pro Tem., concur.

Review granted at 130 Wn.2d 1006 (1996).