# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

CINDY ALEXANDER; BLOCKER
VENTURES, LLC; CHRIS CLARK;
R. BRUCE EDGINGTON; KIPP
JOHNSON and JENNIFER JOHNSON,
husband and wife; GOPIKRISHNA
KANURI and HIMABINDU KANURI,
husband and wife; CHRIS KASPRZAK
and ELIZABETH KASPRZAK, husband
and wife; PAUL LARKINS and JOYCE
HYOJUNG LARKINS, husband and
wife; KRISTINE MAGNUSSEN; SCOTT
McKILLOP; CAINE OTT and DANA
OTT, husband and wife; MARA
PATTON; PETER RICHARDS; DANTE
SCHULTZ; WINIFRED D. SMITH;
ROBERT STODDARD and COLETTE
STODDARD, husband and wife; NEIL
WEST; LIANG XU and JIA LU DUAN,
husband and wife,

    Appellants/Cross Respondents,

        v.

GARY SANFORD and JANE DOE
SANFORD, and their marital
community; PAUL BURCKHARD and
MURIEL BURCKHARD, and their
marital community; JAMES SANSBURN
and JANE DOE SANSBURN, and their
marital community; LOZIER HOMES
CORPORATION, a Washington
corporation;

    Respondents/Cross Appellants,

RICHARD PETER and JANE DOE
PETER, and their marital community;
SHANA HOLLEY and RICHARD
HOLLEY, and their marital community;
BRETT BACKUES and JANE DOE
BACKUES, and their marital community;
JOSEPH CUSIMANO and JANE DOE

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

DIVISION ONE

No. 69637-8-I

PUBLISHED OPINION

2014 MAY 12 AM 9:12
COURT OF APPEALS DIV I
STATE OF WASHINGTON
FILED

No. 69637-8-I/2

CUSIMANO, and their marital ) 
community; PATRICIA HOVDA and ) 
JOHN DOE HOVDA, and their marital ) 
community; ALEXANDER W. PHILIP ) 
and NATALIA T. PHILIP, and their ) 
marital community, ) 
) 
              Respondents, ) 
) 
JASON FARNSWORTH and JANE ) 
DOE FARNSWORTH, and their marital ) 
community; HUCKLEBERRY CIRCLE, ) 
LLC, a Washington limited liability ) 
company; DIANE GLENN and JOHN ) 
DOE GLENN, and their marital ) 
community; CONSTRUCTION ) 
CONSULTANTS OF WASHINGTON, ) 
LLC, a Washington limited liability ) 
company, ) 
) 
              Defendants. )      FILED: May 12, 2014
)
_____ )

DWYER, J. — Eighteen condominium owners (collectively Homeowners)

filed suit against Gary Sanford, Paul Burckhard, James Sansburn, Richard Peter,

Shana Holley, Brett Backues, Joseph Cusimano, Jason Farnsworth, Patricia

Hovda, Alexander Philip, Huckleberry Circle, LLC, Lozier Homes Corporation,

Diane Glenn, and Construction Consultants of Washington, LLC[1] for breach of

the board member duty of care, negligence, violation of the Consumer Protection

Act[2] (CPA), negligent misrepresentation, fraud by omission and

misrepresentation, and civil conspiracy.  Pursuant to Civil Rule (CR) 12(b)(6), the

trial court dismissed Homeowners' claims against Respondents as untimely

_____

[1] Huckleberry Circle, LLC, Farnsworth, Glenn, and Constructions Consultants of Washington, LLC are not party to this appeal.  All of the defendants who are party to this appeal are hereinafter referred to collectively as "Respondents."

[2] Ch. 19.86 RCW.

- 2 -

filed.[3] Homeowners appealed. Sanford, Burckhard, Sansburn, and Lozier Homes cross appealed, asserting that the trial court erred by declining to award attorney fees against Homeowners for filing a frivolous lawsuit.

Contrary to the trial court's ruling, we hold that Washington law does not provide that a cause of action necessarily accrues against a corporate board member no later than upon the board member's resignation. We hold, instead, that the doctrine of adverse domination applies in Washington. The application of that doctrine to the pleadings in this case demonstrates that several of Homeowners' claims should not have been dismissed on the face of the complaint as untimely filed. However, given that we also hold both that directors of a homeowners' association do not owe fiduciary-like duties to future purchasers and that Homeowners failed to plead all of the elements of a CPA claim, various of Homeowners claims were properly dismissed. Accordingly, we affirm in part and reverse in part.

I

A trial court's ruling on a motion to dismiss under CR 12(b)(6) presents a question of law, which we review de novo. Cutler v. Phillips Petroleum Co., 124 Wn.2d 749, 755, 881 P.2d 216 (1994). A CR 12(b)(6) motion questions only the legal sufficiency of the allegations in a pleading, asking whether there is an insuperable bar to relief. Contreras v. Crown Zellerbach Corp., 88 Wn.2d 735,

---

[3] Glenn and Construction Consultants filed similar motions, but the trial court declined to dismiss the claims against them. Homeowners' claims against Glenn and Construction Consultants were dismissed without prejudice upon stipulation of the parties on November 26, 2012.

- 3 -

742, 565 P.2d 1173 (1977). The purpose of CR 12(b)(6) is to weed out complaints where, even if that which the plaintiff alleges is true, the law does not provide a remedy. McCurry v. Chevy Chase Bank, FSB, 169 Wn.2d 96, 101, 233 P.3d 861 (2010).

> Under CR 12(b)(6), dismissal is appropriate only if "it appears beyond doubt that the plaintiff cannot prove any set of facts which would justify recovery." [Tenore v. AT&T Wireless Servs., 136 Wn.2d 322, 330, 962 P.2d 104 (1998)]. In undertaking such an analysis, "a plaintiff's allegations are presumed to be true and a court may consider hypothetical facts not included in the record." Id.

Burton v. Lehman, 153 Wn.2d 416, 422, 103 P.3d 1230 (2005).

II

Homeowners all own residential units at Huckleberry Circle condominium complex in Issaquah.[4] The declarant of the complex is Huckleberry Circle, LLC (Declarant). The Declarant's sole member is Lozier Homes Corporation (Lozier Homes). All unit owners in the complex are members of the Huckleberry Circle Condominium Owners Association (Association), which is governed by a three voting-member board of directors. The Association was created on June 29, 2000.

The Association's first board consisted of Sanford, Burckhard, and Sansburn. In their complaint, Homeowners allege that at the time of development, Declarant, Lozier Homes, Sanford, Burckhard, and Sansburn were aware, or should have been aware, that the complex "was not being designed or

---

[4] The substantive facts set forth herein are as presented in Homeowners' complaint, consistent with the CR 12(b)(6) standard of review. Burton, 153 Wn.2d at 422.

constructed in a manner consistent with minimum requirements of building code [sic] with respect to weatherproofing." Homeowners further allege that insufficient weatherproofing was a pervasive problem throughout this region, and that Declarant, Lozier Homes, Sanford, Burckhard, and Sansburn were aware of this fact at that time.

Declarant, Lozier Homes, Sanford, Burckhard, and Sansburn prepared a limited warranty, developed a "maintenance program," and hired a "licensed inspector" for the complex. Homeowners allege that the purpose of these actions "was to give the appearance of due diligent inspection of the construction quality of the building envelope, while not in fact undertaking an intrusive investigation of building components which would have revealed water intrusion." Declarant, Lozier Homes, Sanford, Burckhard, and Sansburn retained Glenn, d/b/a The Construction Consultants, as the complex's inspector. Glenn was not a licensed inspector but, rather, was a political activist for the building industry.

Homeowners further allege that, in order to protect themselves from liability, Declarant, Lozier Homes, Sanford, Burckhard, and Sansburn included provisions in the project declaration that allowed Declarant to appoint a fourth nonvoting member to the board and that limited "the power of the Association's Board and the Association to engage in litigation against the Declarant for violation of the implied warranties of quality under the Washington Condominium Act."

Burckhard resigned from the board on May 15, 2001, at which time he was replaced by Holley. Between May and November 2001, Glenn performed

multiple nonintrusive inspections of the complex, which revealed only minor repair issues. On May 9, 2002, Sansburn and Holley resigned from the board, and the Association elected Backues, Cusimano, and Peter in their place. On that same date, Declarant exercised its right to add a nonvoting member to the board. Declarant appointed Sanford to this position.[5] Homeowners allege that "Sanford's role on the Board was to monitor its efforts to evaluate the construction quality of the Project, and dissuade the Board from prosecuting the Association's warranty rights."

On August 13, 2002, the board hired Glenn to perform another inspection of the complex. Homeowners allege that "Sanford did not advise the Board that Glenn had no experience in helping condominium associations identify concealed defects and damage." Glenn's inspection again did not find any serious issues or defects.

In March 2003, Ken Harer, a construction defect attorney and architect, contacted the board in order to inform it that the complex showed signs of potentially serious hidden construction defects and that the statutory limitation period on any warranty claims would soon expire. Peter met with Harer, who explained his concerns. Shortly thereafter, Peter e-mailed Backues and Cusimano regarding the meeting and expressed concern that he might have a conflict of interest because he was employed by an affiliate of Lozier Homes. The board took no action based on Harer's advice.

---

[5] The complaint lists only Sansburn as resigning from the board on May 9. However, it asserts that Backues, Cusimano, and Peter were elected at this time as the new three-member board, with Sanford assuming the fourth, nonvoting, position.

Peter notified the board in April 2003 that he intended to resign, but the board instead had him switch terms with another member so that someone could be elected to replace him in May. Also that April, the board received its first complaint of water leaking through a window in one of the units. None of this information appeared in any of the board's minutes. Homeowners allege that "the decision to omit these facts from the minutes was part of a deliberate effort on the part of Defendant Peter and/or the other Board members to conceal material information from unit owners."

Peter resigned from the board on May 29, 2003, and Farnsworth was elected to replace him. On August 20, 2003, the property manager contacted contractor Mark Jobe regarding bids for deck maintenance and deck drainage issues. Jobe stated:

> Yes, that is a project I am familiar with. There appears to be a serious problem with deck slope. Ponded water is present under the sleeper. Also while I was there I noted the flashing above the brick veneer has been caulked closed. Closed flashing is a serious problem that generally leads to big issues. Also it is often used to mask other problems. This should be looked into. Would be glad to assist.

The board took no action upon receiving Jobe's warnings.

On September 22, 2003, the board received its second complaint of water leaking into a unit. On October 17, 2003, the board met to consider hiring a structural engineer to inspect the decks at the complex; however, no further action to hire an engineer was taken. The board thereafter received a third complaint about water leaking into a unit. Following the receipt of this complaint,

"Sanford volunteered Lozier and the Declarant" to perform deck inspections. On January 18, 2004, Backues resigned from the board.

In March 2004, a unit owner complained directly to Lozier Homes of a leak in the owner's unit. Sanford, who was still the board's nonvoting member, wrote a letter to the property manager, blaming the leak on "gaps in caulking in the siding and wood trim around the decks . . . and clogged weepholes in window frames." Sanford wrote a second letter to the property manager in April, alleging that the same conditions had caused a leak in another unit. Homeowners allege that Sanford wrote these letters in order to discourage prosecution of a warranty claim.

In June 2004, Glenn performed another exterior visual inspection at the complex. Homeowners allege that this inspection "was not reasonably calculated to determine the actual source of water leaks." Glenn recommended maintenance in the form of caulking and painting, but again found no major problems. Glenn performed another similar inspection in November 2004, and again recommended caulking and painting.

On November 6, 2004, the statutory limitation period applicable to a claim for breach of implied warranties on common elements under the Washington Condominium Act[6] (WCA) expired.

By March 21, 2005, Farnsworth had resigned from the board. The new board at that time consisted of Cusimano, Philip, and Hovda, with Sanford remaining as the nonvoting member. In August 2005, the board again hired

---

[6] Ch. 64.34 RCW.

Glenn to perform an inspection of the property and again she found no serious defects at the complex. Meanwhile, the board continued to receive multiple complaints from unit owners about leaks through windows, decks, and doors. Nonetheless, Homeowners allege, the board "did not reveal the scope of the problem to the ownership at large, and consistently failed to take systematic action to address the defects." Efforts to reseal and caulk windows and doors were represented as "preventative measures," instead of responses to the complained-of leaks. Philip and "[t]he other Board members cooperated or agreed that the scope of the problem should be concealed, so as to retain property values" and, thereafter, the board "continued to actively conceal the scope of the complaints and the level of their concerns about the potential water intrusion problem."

By March 24, 2006, Sanford resigned from the board. On June 27, 2006, Cusimano announced his resignation from the board. On July 20, 2006, Philip resigned from the board.

In July 2008, the board finally approved an intrusive inspection of the building envelope. However, the board told the unit owners that the purpose of the inspection was "to provide your association with a preliminary assessment and a list of priorities pertaining to future building maintenance and repair issues." In October 2008, Peter[7] sent an e-mail to the board requesting that the

---

[7] While it is unclear from the complaint when Peter rejoined the board, Homeowners stipulated that "no conduct during his later term as member of the Association's Board of Directors was a cause of any additional injury to Plaintiffs for which Plaintiffs seek to recover in this matter."

board decline to be informed of the results of the inspection until a later time, because "findings would impair the marketability of units." The board agreed. The board did not receive the results of the inspection until March 2009.

> The inspection performed by Improcon and Grace Architects revealed that
>
> "every major component of the building envelope is suffering from poor or deficient construction and waterproofing detailing throughout, resulting in varying degrees of failure around the property . . . the pace of this intrusion and related damage will continue to accelerate until comprehensive and proper repairs are made to the building envelope."

(Alteration in original.) The board did not share the results of the inspection with the unit owners.

Homeowners allege that "[a]t an October 27, 2009 HOA meeting, homeowners presented questions about the details of water intrusion repairs. The Board replied that the answers were not known, and individuals with specific complaints were directed to the Project property manager." In January 2010, the board hired J2 Engineers to create a repair plan for the defects revealed by the inspection. On March 3, 2011, the board received a partial estimate for the cost of repair which totaled approximately $2.4 million. At a homeowners meeting on April 24, 2011, the board declared a budget that included a special assessment for the cost of repair. That May, the Association imposed a special assessment on the unit owners in excess of $2.5 million to fund the repairs.

In September 2011, Homeowners filed suit against all of the prior board members,[8] Declarant, Lozier Homes, Glenn, and Construction Consultants. In response, Cusimano, Lozier Homes, Sanford, Burckhard, and Sansburn filed CR 12(b)(6) motions to dismiss for failure to state a claim, asserting that Homeowners' complaint had been filed long after the statutory limitation period had run on all claims.

The trial court ruled that the statutory limitation period applicable to Homeowners' claims was three years and that "the statute of limitation for actions against the named defendants began to run at the time he or she resigned from the Board." Additionally, the trial court stated that it "need not reach the issue of whether the plaintiffs knew or should have known of the construction issues as to these defendants," because the defendants, once they left the board, "were not and could not have been engaged . . . in any continuing fraud or omission." The trial court therefore granted Cusimano's, Lozier Homes's, Sanford's, Burckhard's, and Sansburn's motions to dismiss.

Lozier Homes, Sanford, Sansburn, and Burckhard thereafter moved for an award of attorney fees, asserting that Homeowners' claim against them was frivolous. In response, counsel for Homeowners submitted extensive documentation of the research he had conducted prior to drafting the complaint.[9]

---

[8] The complaint also named the spouses of the individual board members, alleging that all acts and omissions committed by the board members had been done on behalf of their marital communities.

[9] Counsel attached a total of 94 exhibits to his opposition to the request for attorney fees.

After considering all of the submitted documentation, the trial court declined to award fees to Lozier Homes, Sanford, Burckhard, and Sansburn.

Homeowners stipulated that all individually named board members had resigned at some unidentified time before September 2008.[10] Thereafter, Peter, Holley, Backues, Hovda, and Philip also filed CR 12(b)(6) motions to dismiss for failure to state a claim.[11] The trial court granted these motions for the same reason it had granted the prior motions.

Homeowners appeal the trial court's rulings on the motions to dismiss. Lozier Homes, Sanford, Burckhard, and Sansburn cross appeal the trial court's order denying their claim for an award of attorney fees.

III

Respondents contend that the trial court's dismissal of Homeowners' claim was proper because Homeowners lacked standing to file suit. This is so, Respondents assert, because the Washington Nonprofit Corporation Act[12] does not permit derivative actions. Because the claims asserted herein were not derivative claims, this contention fails.

---

[10] As alleged in the complaint, the terms served by the board members are as follows:
Sanford – June 29, 2000 to March 24, 2006
Burckhard – June 29, 2000 to May 15, 2001
Sansburn – June 29, 2000 to May 9, 2002
Holley – May 15, 2001 to May 9, 2002
Backues – May 9, 2002 to January 18, 2004
Cusimano – May 9, 2002 to June 27, 2006
Peter – May 9, 2002 to May 29, 2003
Philip – March 21, 2005 to July 20, 2006
Hovda – March 21, 2005 to unknown date before September 2008
[11] Huckleberry Circle, LLC and Richard Holley (spouse of Shana Holley) failed to answer Homeowners' complaint, and the trial court granted default judgments against them. Farnsworth was never served with a copy of the complaint.
[12] Ch. 24.03 RCW.

- 12 -

"Standing is a threshold issue, which we review de novo." In re Estate of Becker, 177 Wn.2d 242, 246, 298 P.3d 720 (2013). "To have standing, one must have some protectable interest that has been invaded or is about to be invaded." Orion Corp. v. State, 103 Wn.2d 441, 455, 693 P.2d 1369 (1985).

Homeowners asserted that they sustained damages to their individual property.[13] In cases alleging property damage, homeowners' associations may file suit on behalf of unit owners. RCW 64.34.304(1)(d). However, absent allegations of damage to the association itself, the homeowners' association lacks independent standing to sue for physical damage to a unit owner's property.[14] Satomi Owners Ass'n. v. Satomi, LLC, 167 Wn.2d 781, 812, 225 P.3d 213 (2009). In such an instance, it is not the unit owners but the association whose claims are derivative. Satomi Owners Ass'n. v. Satomi, LLC, 139 Wn. App. 175, 180, 159 P.3d 460 (2007), rev'd on other grounds, 167 Wn.2d 781, 225 P.3d 213 (2009). Because Homeowners allege damage to their own

---

[13] Homeowners' complaint seeks the following remedies: "Such damages include, but are not limited to: plaintiffs' proportional responsibility to pay for the cost to correct defective conditions and repair resulting property damage at the Project (including investigative costs, scope of repair development costs, design costs, inspection costs, contractor costs, project management costs, repair financing costs, and all other costs associated with such repairs); increased costs to correct defective conditions and repair resulting property damage as a consequence of inaction; loss of marketability, use and value of plaintiffs' property; increased reserve expenses; relocation costs; and attorney fees and other costs incurred in prosecuting this action."

[14] This is the case even when the alleged damages include the cost of repairs throughout the condominium complex. In Satomi, the association alleged damages including "'the cost of repairing the project . . . and resulting monetary and material harm.'" 167 Wn.2d at 811-12. The court held that these damages were sustained by the homeowners and not the association itself. "The only property identified in Blakeley Association's complaint, however, is the condominium project's units, common elements, and limited common elements, which are owned by the unit owners, not Blakeley Association. Thus, Blakeley Association has not alleged damage to any property in which it has a protectable interest." Satomi, 167 Wn.2d at 812 (footnote omitted). Here, the Association levied an assessment upon the unit owners for the repairs to the building envelopes. The "cost of repairing the project" is a damage sustained by the unit owners, not the association itself. Satomi, 167 Wn.2d at 812. Thus, the claims here belong to Homeowners.

No. 69637-8-I/14

property, they have standing to assert their claims.[15]

IV

A

Homeowners contend that the discovery rule delayed the accrual of the causes of action as to all defendants on all claims, regardless of when various board members resigned from the board.[16] We agree, insofar as the issue should not have been decided adversely to Homeowners as a matter of law on a CR 12(b)(6) motion.

The discovery rule is an exception to the normal rules governing when a cause of action accrues. In re Estates of Hibbard, 118 Wn.2d 737, 744-45, 826 P.2d 690 (1992).

> Application of the rule is limited to claims in which the plaintiffs could not have immediately known of their injuries due to professional malpractice, occupational diseases, self-reporting or concealment of information by the defendant. Application of the rule is extended to claims in which plaintiffs could not immediately know of the cause of their injuries.

Hibbard, 118 Wn.2d at 749-50. "Under the discovery rule, a cause of action accrues when the plaintiff knew or should have known the essential elements of

---

[15] As Homeowners' claims are not derivative, we need not decide whether unit owners may bring a derivative suit on behalf of a homeowners' association.

[16] Respondents contend that because Homeowners' claims are essentially for loss of a chance to sue Declarant under the WCA for defective construction, their claims are time-barred by the WCA's statute of limitations. This is a mischaracterization of Homeowners' claims, which are based on alleged occurrences taking place after construction was completed. No claim for defective construction is asserted.

- 14 -

the cause of action."[17] Allen v. State, 118 Wn.2d 753, 757-58, 826 P.2d 200 (1992) (footnote omitted).

Here, the trial court ruled that the relevant statutory limitation period is three years.[18] The trial court did not apply the discovery rule, ruling instead that Homeowners' causes of action accrued no later than when each individual defendant resigned from the board. The trial court did not cite any authority for its conclusion. Respondents, however, in their CR 12(b)(6) motions and again on appeal, rely on Gillespie v. Seattle-First National Bank, 70 Wn. App. 150, 855 P.2d 680 (1993), and Quinn v. Connelly, 63 Wn. App. 733, 821 P.2d 1256 (1992), to support their assertion that "it is black-letter law that a claim against a fiduciary such as a board member accrues as a matter of law, at the latest and regardless of discovery, at the time that fiduciary resigns his or her position." To the contrary, neither Gillespie nor Quinn established any such general rule.

In Gillespie, we held that former RCW 11.96.060(1) (1985) mandates that "an action against the trustee of any express trust for any breach of fiduciary duty must be brought within 3 years from *the earlier of* the time the alleged breach was discovered or reasonably should have been discovered or the termination of the trust," and that, therefore, the limitation period commences no later than at the time the trust terminates. 70 Wn. App. at 161. In that case, we answered a

---

[17] Homeowners claim that there exists inconsistency in our case law concerning which party bears the burden of proving when a plaintiff knew or should have known of the essential elements of a cause of action. This case was decided on a CR 12(b)(6) motion to dismiss, which does not impose a proof burden on either party. To the contrary, any fact alleged by plaintiffs is taken as true. Thus, we need not herein resolve the perceived lack of clarity, if any.

[18] Neither party disputes this ruling. However, the limitation period for a CPA claim is four years, not three. RCW 19.86.120.

question of statutory interpretation; we did not purport to establish a rule applicable to all fiduciary relationships. As former RCW 11.96.060(1) bears no relevance to the case at hand, Gillespie is inapposite.

In Quinn, we held that any fraudulent concealment by an attorney, which might serve to toll the commencement of a statutory limitation period, ends when the attorney-client relationship ends, unless the attorney takes further steps to extend the concealment. 63 Wn. App. at 741. We articulated two bases for our holding that the plaintiff had not brought his claim of legal malpractice within the applicable limitation period. First, we relied upon the rule established in Richardson v. Denend, 59 Wn. App. 92, 96-97, 795 P.2d 1192 (1990), which states that "upon entry of the judgment, a client, as a matter of law, possesses knowledge of all the facts which may give rise to his or her cause of action for negligent representation." Quinn, 63 Wn. App. at 737. Second, we held that the plaintiff had not alleged that his attorney took any steps after the entry of judgment to conceal his negligence. Quinn, 63 Wn. App. at 742. Again, we did not purport to establish a rule applicable to all fiduciary relationships. Indeed, Division Two has rejected the argument that a statutory limitation period automatically begins to toll when a fiduciary relationship ends. Doe v. Finch, 81 Wn. App. 342, 351, 914 P.2d 756 (1996) ("Although a breach of professional duty generally must occur before the professional relationship ends, the intentional concealment of a breach can continue after the relationship has ended." (footnote omitted)), aff'd, 133 Wn.2d 96, 942 P.2d 359 (1997).

B

Contrary to Respondents' assertion, Washington has no current "black-letter law" directly on point.[19] However, a distinct majority of jurisdictions to consider the issue hold that claims against a corporate board member do not necessarily accrue when that individual resigns from the board; rather, these jurisdictions follow what is known as the doctrine of adverse domination. E.g. Wilson v. Paine, 288 S.W.3d 284, 290-91 (Ky. 2009); Fed. Deposit Ins. Corp. v. Smith, 328 Or. 420, 430, 980 P.2d 141 (1999); Demoulas v. Demoulas Super Mkts., Inc., 424 Mass. 501, 523, 677 N.E.2d 159 (1997); Safecard Servs., Inc. v. Halmos, 912 P.2d 1132, 1135 (Wyo. 1996); Resolution Trust Corp. v. Grant, 901 P.2d 807, 809, 814 (Okla. 1995); Resolution Trust Corp. v. Scaletty, 257 Kan. 348, 356, 891 P.2d 1110 (1995); Hecht v. Resolution Trust Corp., 333 Md. 324, 352, 635 A.2d 394 (1994); Clark v. Milam, 192 W.Va. 398, 403, 452 S.E.2d 714 (1994); Favila v. Katten Muchin Rosenman LLP, 188 Cal.App.4th 189, 225 n.26 115 Cal.Rptr.3d 274 (Cal. App. 2 Dist., 2010); Lease Resolution Corp. v. Larney, 308 Ill. App. 3d 80, 86, 719 N.E.2d 165 (Ill. Ct. App. 1999); Mut. Sec. Life Ins. Co. by Bennett v. Fid. & Deposit Co. of Maryland, 659 N.E.2d 1096, 1102 (Ind. Ct. App. 1995). Contra Chinese Merchs. Ass'n v. Chin, 159 Ohio App.3d 292, 297,

---

[19] The closest Washington has come to deciding the issue presented here was in Interlake Porsche & Audi, Inc. v. Bucholz, 45 Wn. App. 502, 728 P.2d 597 (1986). In that case, the corporation was directed by three shareholders, only one of whom was named as a culpable defendant. Interlake Porsche, 45 Wn. App. at 505. One of the other directors had actual knowledge of fraud by the culpable board member; that knowledge was thus imputed to the corporation. Interlake Porsche, 45 Wn. App. at 518. In this case, however, Homeowners allege that all board members are culpable, raising a factual scenario distinct from that presented in Interlake Porsche.

823 N.E.2d 900 (Ohio Ct. App. 2004).[20] The doctrine of adverse domination presumes that a corporate plaintiff cannot have notice of wrongdoing by directors when those directors are in control of the corporation.[21] Hecht, 333 Md. at 346. This presumption is, of course, rebuttable by a showing that "someone other than the wrongdoing directors had knowledge of the basis for the cause of action, combined with the ability and the motivation to bring an action." Smith, 328 Or. at 427.

The doctrine of adverse domination is a corollary of the discovery rule. Hecht, 333 Md. at 346; see also Resolution Trust Corp. v. Farmer, 865 F.Supp. 1143, 1154 n.11 (E.D.Pa.1994). Some jurisdictions that have adopted the doctrine of adverse domination have done so on the basis that it is analogous to the discovery rule. See, e.g., Smith, 328 Or. at 430 ("Oregon recognizes the adverse domination doctrine, which is analogous to Oregon's discovery rule."); Larney, 308 Ill. App. 3d at 86 ("Logical application of the discovery rule and agency law principles leads to recognition of the adverse domination doctrine."). Washington applies the discovery rule to "claims in which the plaintiffs could not have immediately known of their injuries due to . . . concealment of information by the defendant." Hibbard, 118 Wn.2d at 749-50. We hold that because

---

[20] In addition, some jurisdictions follow the doctrine of adverse domination without referring to it as such. E.g., United Park City Mines Co. v. Greater Park City Co., 870 P.2d 880, 885 (Utah 1993); Kahn v. Seaboard Corp., 625 A.2d 269, 275-77 (Del.Ch. 1993); Allen v. Wilkerson, 396 S.W.2d 493, 502 (Tex.Civ.App. 1965); Bates St. Shirt Co. v. Waite, 130 Me. 352, 156 A. 293, 297 (1931); Ventress v. Wallace, 71 So. 636, 641 (Miss. 1916). Contra Access Point Med., LLC v. Mandell, 106 A.D.3d 40, 45, 963 N.Y.S.2d 44 (N.Y.A.D. 1 Dept. 2013) ("[T]he statute of limitations on claims against a fiduciary," including corporate officers, "for breach of its duty is tolled until such time as the fiduciary openly repudiates the role.").

[21] The doctrine has also been applied to claims against third parties who act as board members' co-conspirators. Larney, 308 Ill. App. 3d at 89-90.

Washington utilizes the discovery rule, the doctrine of adverse domination is also applicable in this state.

C

Having concluded that Washington recognizes the doctrine of adverse domination, we must now decide which version of the doctrine best comports with Washington law. This inquiry requires us to answer two questions: (1) What is the level of culpability that the board members must exhibit in order for the doctrine to apply? and (2) Must the plaintiff implicate all board members, or only a majority thereof?

There exists disagreement among jurisdictions as to the level of culpability required in order for the doctrine of adverse domination to apply.

> Three theories have emerged. One theory holds that negligent conduct, without more, is sufficient to toll the statute of limitations. See Federal Deposit Ins. Corp. v. Carlson, 698 F.Supp. 178, 180 (D.Minn.1988). More recently, courts have held that negligent conduct is not enough to warrant the application of adverse domination. See [Fed. Deposit Ins. Corp. v.] Dawson, 4 F.3d [1303,] 1313 [(5th Cir. 1993)]; Resolution Trust Corp. v. Acton, 49 F.3d 1086 (5th Cir.1995); Farmer, 865 F.Supp. at 1157. These courts, however, have not defined exactly what level of culpability is required. Lastly, at least one court has held that the degree of culpability was irrelevant; because the reason for tolling the statute of limitations is that the plaintiffs cannot discover the cause of action. Clark, 452 S.E.2d at 719.

Wilson, 288 S.W.3d at 290.

The Kentucky Supreme Court held that the doctrine of adverse domination may be invoked only where intentional wrongdoing is alleged. Its reason for so holding, the court stated, was that

- 19 -

> [t]he doctrine is founded on the presumption that those who engage in fraudulent activity likely will make it difficult for others to discover their misconduct. "[T]he danger of fraudulent concealment by a culpable majority of a corporation's board seems small indeed when the culpable directors' behavior consists only of *negligence* . . . ." [Dawson, 4 F.3d] at 1312-13 (emphasis added).

Wilson, 288 S.W. 3d at 290 (alterations in original).

The West Virginia Supreme Court of Appeals, on the other hand, held that the doctrine of adverse domination could apply regardless of the directors' degree of culpability. That court determined that "regardless of whether the alleged wrongdoing was intentional or merely negligent, the knowledge of officers' and directors' wrongdoing cannot be imputed to the corporation because those officers' and directors' control over the corporation prevents it from learning of the misconduct that is injuring it." Clark, 192 W.Va. at 403. This was so, the court stated, because "a corporation . . . [can be] prevented from discovering its claims against those in control . . . by the sheer fact of their control." Clark, 192 W.Va. at 403. One such example, the court offered, was when "'the directors and officers may be so disengaged from their responsibilities that they themselves are unaware of the breach of their duty to the corporation.'" Clark, 192 W.Va. at 403 (quoting Hecht, 333 Md. at 348).

In our view, a standard similar to that applied by Kentucky courts better accounts for the reality of the modern corporate structure. In order for the discovery rule to apply, the situation must be one "in which plaintiffs could not immediately know of the cause of their injuries." Hibbard, 118 Wn.2d at 750. This type of situation is unlikely to exist where the directors are merely

- 20 -

"disengaged" and not concealing information from the shareholders. Although shareholders might not immediately know the cause of their injuries if they are inattentive to the corporation's mismanagement, the discovery rule does not apply where "the plaintiff [was] sleeping on his rights." Crisman v. Crisman, 85 Wn. App. 15, 20, 931 P.2d 163 (1997). In light of Washington's discovery rule, we hold that the doctrine of adverse domination applies only where the plaintiff alleges concealment by board members.[22]

## D

This leads us to our second question: Must the plaintiff implicate all board members in the concealment, or only a majority? Among other courts, two different approaches have emerged:

> The more difficult test is the "complete domination" test, under which a plaintiff who seeks to toll the statute under adverse domination must show "full, complete and exclusive control in the directors or officers charged." Mosesian v. Peat, Marwick, Mitchell & Co., 727 F.2d 873, 879 (9th Cir. [1984]) (quoting International Rys. of Cent. Am. v. United Fruit Co., 373 F.2d 408, 414 (2d Cir.), cert. denied, 387 U.S. 921, 87 S. Ct. 2031, 18 L. Ed. 2d 975 (1967)), cert. denied, 469 U.S. 932, 105 S. Ct. 329, 83 L. Ed. 2d 265 (1984). Once the facts giving rise to possible liability are known, the plaintiff must effectively negate the possibility that an informed stockholder or director could have induced the corporation to sue. Id.

> Other courts have taken a more prophylactic approach known as the "majority test." Under this approach, the plaintiff need not show that the wrongdoers completely dominated the corporation, but rather must show only that a majority of the board members were wrongdoers during period the plaintiff seeks to toll the statute.

---

[22] This is not necessarily to say that the plaintiffs must plead a separate claim of concealment. Nor must the alleged concealment necessarily be fraudulent. Washington law does not require that concealment be fraudulent in order for the discovery rule to apply. See Doe, 133 Wn.2d at 101. The same principle holds true for the doctrine of adverse domination.

> [Fed. Deposit Ins. Corp. v. ]Howse, 736 F.Supp. [1437,] 1441-42
> [(S.D.Tex. 1990)]; Federal Sav. and Loan Ass'n v. Williams, 599
> F.Supp. 1184, 1193–94 (D.Md.1984). These cases reason that the
> mere existence of a culpable majority on the board is so likely to
> preclude the corporation from filing suit against the wrongdoers that
> tolling is thereby justified. See, e.g., Williams, 599 F.Supp. at 1194.

Dawson, 4 F.3d at 1309-10.

Many states adopt the "majority test" for policy reasons. In Smith, the Oregon Supreme Court held that, "Because a board composed of a majority of culpable directors will rarely, if ever, facilitate the assertion of claims against its members, it is appropriate that those directors bear the burden of proving otherwise." 328 Or. at 432. The court noted that, "'While [culpable board members] retain control they can dominate the non-culpable directors and control the most likely sources of information.'" Smith, 328 Or. at 432 (quoting Fed. Sav. & Loan Ins. Corp. v. Williams, 599 F.Supp. 1184, 1193-94 n.12 (D.Md. 1984)). This approach comported with Oregon's discovery rule, the court held, because the plaintiff "would be required to plead and prove facts showing that [the corporate board] was adversely dominated." Smith, 328 Or. at 433.

On the other hand, states that adopt the "complete domination" test, also typically do so for policy reasons. In Aiello v. Aiello, 447 Mass. 388, 404, 852 N.E.2d 68 (2006), the Massachusetts Supreme Court determined that the "complete domination" test more closely comported with modern corporate law. Specifically, the court focused on the role of corporate shareholders. The court stated that "a corporate shareholder who discovers that directors or officers have injured a corporation may, in many cases, bring a derivative suit on that

- 22 -

corporation's behalf." Aiello, 447 Mass. at 403. As such, the court held, "[t]he mere existence of a majority of culpable directors should not lead to a presumption that a corporate plaintiff is unable to discover or redress the wrongs perpetrated by such directors, thereby tolling a statute of limitations." Aiello, 447 Mass. at 403.

We deem the "majority test" more consonant with Washington law. We agree with the Oregon Supreme Court that, "'While [culpable board members] retain control they can dominate the non-culpable directors and control the most likely sources of information.'" Smith, 328 Or. at 432 (quoting Williams, 599 F.Supp. at 1193-94 n.12). We can easily envision a scenario in which non-culpable minority board members are "kept out of the loop" or even intimidated into submission by culpable board members determined to conceal their wrongdoing. In instances such as these, the culpable majority can effectively prevent the shareholders from learning of their wrongdoing. In such a situation, "'it is appropriate for the directors to bear the burden of rebutting a presumption of control, because they have greater access to the relevant information.'" Wilson, 288 S.W.3d at 289 (quoting Grant, 901 P.2d at 818). Thus, we will apply the "majority test" for adverse domination.[23]

---

[23] Respondents contend that concealment by a board member tolls the statute of limitation against that particular board member only and not as to any other board member. Respondents rely on United States v. Read, 658 F.2d 1225 (7th Cir. 1981), and Barker v. American Mobil Power Corp., 64 F.3d 1397 (9th Cir. 1995), for this assertion. Neither case supports such a conclusion. Read is a criminal case regarding withdrawal from a conspiracy, a completely different issue than that asserted here. In Barker, the Ninth Circuit held that concealment by subsequent trustees did not toll the statute of limitation against prior trustees, where the plaintiff failed to allege any fraud or concealment by the prior trustees. Barker, 64 F.3d

E

Typically the doctrine of adverse domination applies to derivative actions brought by shareholders on behalf of the corporation. In this case, however, the claims were brought by the unit owners in their individual capacity, not on behalf of the Association. Thus, the question is whether the doctrine of adverse domination can apply to claims brought by individuals. We hold that it can, at least in lawsuits premised upon duties or obligations stemming from the WCA.

The doctrine of adverse domination stems from the same or similar principles that underlie other equitable tolling doctrines. The West Virginia Supreme Court of Appeals has recognized that the doctrine of adverse domination is similar to the doctrine of continuous representation. Smith v. Stacy, 198 W.Va. 498, 505, 482 S.E.2d 115 (1996) (citing Clark, 192 W.Va. 398). As the Stacy court noted, Clark applied the doctrine of adverse domination to claims against a corporation's attorneys, in addition to its board members, because the attorneys, "'owing fiduciary duties to the company, . . . took action contributing to the adverse domination of the company.'" Stacy, 198 W.Va. at 505 (quoting Clark, 192 W.Va. at 399). The Stacy court cited Clark among its bases for adopting the continuous representation doctrine in West Virginia. Stacy, 198 W.Va. at 505.

We, likewise, find these two doctrines similar. Washington law recognizes the doctrine of continuous representation in legal malpractice litigation. Janicki

---

at 1401-02. Here, Homeowners allege concealment by all board members, rendering Barker inapposite.

Logging & Constr. Co. v. Schwabe, Williamson & Wyatt, PC, 109 Wn. App. 655, 663, 37 P.3d 309 (2001). We have suggested that the doctrine may also apply in cases of accounting malpractice. Burns v. McClinton, 135 Wn. App. 285, 299, 143 P.3d 630 (2006) (declining to apply continuous representation where plaintiff's claim was not for failure to "provide adequate accounting services"). As we have held previously, the continuous representation doctrine "prevents an attorney from defeating a malpractice claim by continuing representation until the statute of limitations has expired." Janicki, 109 Wn. App. at 662. The continuing representation doctrine prevents the limitation period from commencing so long as the attorney continues to represent the client on that particular matter. Janicki, 109 Wn. App. at 663-64.

The doctrine of adverse domination functions in a similar manner. The doctrine prevents corporate board members from defeating claims by continuing to dominate the board. See Hecht, 333 Md. at 351 ("This prevents the culpable directors from benefiting from their lack of action on behalf of the corporation."); In re Blackburn, 209 B.R. 4, 10 (Bankr. M.D.Fla. 1997) (adverse domination is "grounded in the equitable notion that the receiver should not be time barred from pursuing the management of an insurer in liquidation to recover for alleged wrongdoing that management committed while in control of the insurer"). Additionally, when a board is controlled by directors who continue the wrongdoing initiated by their predecessors, the board continues to "represent" the interests of the shareholders (or here, the unit owners) on the particular matter associated with that wrongdoing.

The two doctrines are based on similar rationales. One of the policy reasons underlying Washington's adoption of the continuing representation doctrine was that "'[t]he attorney has the opportunity to remedy, avoid or establish that there was no error or attempt to mitigate the damages.'" Janicki, 109 Wn. App. at 663 (quoting 3 RONALD E. MALLEN & JEFFREY M. SMITH, LEGAL MALPRACTICE § 22.13, at 431 (5th ed.2000)). This rationale also rings true for corporate directors who, while they are in control of the board, have "the opportunity to remedy . . . or attempt to mitigate the damages" caused by prior board members. Shareholders (or unit owners), on the other hand, are generally limited to their ability to file suit or replace the board with new directors whom they hope will be more honest than their predecessors.

As one federal court noted, decisions adopting the doctrine of adverse domination "reflect an implicit appreciation of the realities of the shareholders' position, that, without knowledge of wrongful activities committed by directors, shareholders have no meaningful opportunity to bring suit." F.D.I.C. v. Bird, 516 F. Supp. 647, 651 (D.P.R. 1981). This reality is the same for the unit owners of a homeowners' association. The WCA defines the duties of board members in their governance of the association.[24] It is reasonable for unit owners to expect that the board members will properly discharge those duties. Where board members are concealing their wrongdoing, the unit owners are unlikely to know or to suspect that those duties are being breached, rather than properly

_____

[24] As discussed in section V, infra, the board members' duties extend to the unit owners as well as to the Association.

discharged. Without knowledge of the wrongdoing, the unit owners have no meaningful opportunity to evaluate whether to bring suit against the directors. This is true regardless of whether the unit owners ultimately bring their claims individually or on behalf of the association.

In this case, some of the board member defendants owed a duty of "care required of fiduciaries," while others owed a duty of "ordinary and reasonable care." Regardless of the degree of care owed, the role of the board members is the same—to govern the homeowners' association. See RCW 64.34.300. It would make little sense to apply the doctrine of adverse domination to claims against some of the complicit board members but not to others where the allegations are that a series of directors acted in concert to the detriment of the unit owners. The doctrine of adverse domination concerns itself with directors' concealment of information from the corporation and its constituents. The degree of care owed to a corporate shareholder or association unit owner is unrelated to the danger of concealing their wrongdoing to the detriment of those to whom the duties are owed.

The doctrine of adverse domination applies to claims brought by the individual plaintiffs herein.

F

We must next determine whether the doctrine of adverse domination applies to all of Homeowners' claims or to only some of those claims. There is a split of authority as to whether there is a limit to the types of claims to which the doctrine of adverse domination can apply. For instance, Oklahoma limits the

- 27 -

doctrine of adverse domination to fraud claims. Grant, 901 P.2d at 815-16;

Resolution Trust Corp. v. Greer, 911 P.2d 257, 265 (Okla. 1995). In Grant, the

Oklahoma Supreme Court reasoned that the doctrine of adverse domination was

designed to be narrow, and thus should not apply to all types of claims. 901 P.2d

at 815. The court held,

> We find persuasive the reasoning of those courts which hold that to extend the doctrine to cases involving conduct less culpable than fraud would be to eliminate the statute of limitations in director-liability actions. Furthermore, this reasoning is supported by recent legislative enactments allowing the insertion of liability-limiting clauses in bylaws and certificates of incorporation. Therefore, we find that application of the doctrine of adverse domination to delay accrual or toll the statute of limitations is limited to situations involving fraudulent conduct.

Grant, 901 P.2d at 815-16.

For its holding, the Oklahoma Supreme Court relied heavily on a federal

court decision explaining that, in Texas, the doctrine of adverse domination "must

be limited to those cases in which the culpable directors have been active

participants in wrongdoing or fraud, rather than simply negligent." Dawson, 4

F.3d at 1312. Applying that rule to the case at hand, the Dawson court

explained,

> The facts of the instant case demonstrate that the adverse domination theory is inappropriate when the majority of the board is merely negligent. The FDIC's own evidence tended to show that most of TIB's directors may have been negligent in failing to supervise the lending functions. Yet, at the same time, the board never concealed its "serious deficiencies" from examination by the OCC or anyone else. Even after the OCC notified TIB's board of its shortcomings in supervising TIB's lending function, there is no evidence to suggest that an organized majority coalesced to prevent any other parties from discovering the problems. Thus, the danger of fraudulent concealment by a culpable majority of a

corporation's board seems small indeed when the culpable directors' behavior consists only of negligence, and the presumption of such concealment that underlies the adverse domination theory is unwarranted.

4 F.3d at 1312-13. The court's primary concern was with concealment, more so than the nature of the underlying claim itself.[25]

In contrast, in Oregon and Kansas, the doctrine of adverse domination can apply to all types of claims. The Oregon Supreme Court determined that because the doctrine of adverse domination is a corollary to the discovery rule, the doctrine of adverse domination applies to the same claims that the discovery rule applies to. Smith, 328 Or. at 431. Similarly, the Kansas Supreme Court held that in "determining when . . . the injury to a corporation by its directors is readily ascertainable to the corporation[,] . . . there is no legal basis for us to pick and choose among negligence, gross negligence, or breach of fiduciary duty claims. The same rule must apply to all three types of claims unless the rule is legislatively modified." Scaletty, 257 Kan. at 359.

The view espoused by the Oregon and Kansas courts best comports with Washington law. Washington's discovery rule is not limited to fraud claims. See, e.g. Cox v. Oasis Physical Therapy, PLLC, 153 Wn. App. 176, 190, 222 P.3d 119 (2009) (negligence). "[W]ithholding the reach of adverse domination to cases involving negligence and breach of fiduciary duty would carve out unjustified

---

[25] Moreover, Texas did not have a general discovery rule at that time. Rather, the general rule was "that the tort statute of limitations begins to run when the tort is committed, absent a statute to the contrary or fraudulent concealment." Dawson, 4 F.3d at 1312 (citing Atkins v. Crosland, 417 S.W.2d 150, 153 (Tex. 1967)). The rule has since been expanded, but is still limited to "exceptional cases." Via Net v. TIG Ins. Co., 211 S.W.3d 310, 313 (Tex. 2006).

special exceptions from the . . . discovery rule for corporate officers and directors." Scaletty, 257 Kan. at 358 (citation omitted). The concern of courts such as Grant and Dawson that the doctrine of adverse domination would "overthrow the statute of limitations completely in the corporate context" if applied to negligence claims, Dawson, 4 F.3d at 1312, is adequately allayed by a requirement that the plaintiff must allege concealment in addition to the elements of the claim. Therefore, the doctrine of adverse domination should apply to all claims to which the discovery rule applies.

G

This general rule being established, we turn now to the specific claims asserted in Homeowners' complaint. Homeowners assert the following claims: breach of board member duty of care, negligence, violation of the CPA, negligent misrepresentation, fraud by omission and misrepresentation, and civil conspiracy. As pleaded, the doctrine of adverse domination applies to four of those types of claims.

The doctrine of adverse domination most clearly applies to the claims for breach of board member duty of care. The doctrine of adverse domination is frequently applied to claims for breach of corporate duties. Wilson, 288 S.W.3d at 286; Aiello, 447 Mass. at 389; Smith, 328 Or. at 431; Demoulas, 424 Mass. at 503; Scaletty, 257 Kan. at 359; Clark, 192 W.Va. at 401; Hecht, 333 Md. at 328; United Park City Mines Co. v. Greater Park City Co., 870 P.2d 880, 885 (Utah 1993); Kahn v. Seaboard Corp., 625 A.2d 269, 271 (Del.Ch. 1993). Indeed, the purpose of the doctrine is to protect the corporation and its constituents. It would

be inconsistent with this purpose to *not* apply the doctrine to board member duty of care claims. Thus, the doctrine applies so long as concealment is sufficiently alleged.

Homeowners' adequately plead concealment with respect to the board member duty of care claims. Homeowners allege that the board member defendants "fail[ed] to advise the plaintiffs and others of consistently reported construction problems and other material information, [and] misrepresent[ed] the nature of investigations to plaintiffs." Homeowners allege that the board remained culpable until April 24, 2011, when they declared a budget that included the special assessment. Thus, the Homeowners sufficiently allege that the board continued until that time to conceal the facts that established the basis for these claims. The doctrine of adverse domination therefore applies to these claims.[26]

We next analyze Homeowners' negligence claims against Lozier Homes. Homeowners allege that Lozier Homes breached its duty of reasonable care "in undertaking the construction, inspection, condition reporting, and repair of the

---

[26] The doctrine applies not only to claims against the individual board members, but also to claims against Lozier Homes. Homeowners allege that Lozier Homes is the sole member of Declarant. Pursuant to this allegation, we can envision a hypothetical set of facts, consistent with Homeowners' contention, establishing that Lozier Homes is the alter ego of Declarant. Homeowners also allege that Sanford, Burckhard, and Sansburn were appointed by Declarant. From this allegation, we can envision a hypothetical set of facts, consistent with Homeowners' contention, establishing that Sanford, Burckhard, and Sansburn were agents of Declarant and, thereby, agents of Lozier Homes. If Sanford, Burckhard, and Sansburn are indeed agents of Lozier Homes, then Lozier Homes could be vicariously liable for the actions of these three board members. Accordingly, the doctrine of adverse domination applies to Lozier Homes to the extent that it is implicated as vicariously liable for the actions of Sanford, Burckhard, and Sansburn.

Project."[27] None of the board members were implicated by these negligence claims. Because these claims bear no relation to the governance of the Association, the doctrine of adverse domination does not apply.

Homeowners' attempt to assert CPA claims against Sanford, Burckhard, Sansburn, and Lozier Homes. The discovery rule can apply to CPA claims. Mayer v. Sto Indus. Inc., 123 Wn. App. 443, 463, 98 P.3d 116 (2004), affirmed in part, reversed in part on other grounds, 156 Wn.2d 677, 132 P.3d 115 (2006). Thus, the doctrine of adverse domination can also apply to CPA claims.

Homeowners assert negligent misrepresentation claims against Lozier Homes, Sanford, Burckhard, and Sansburn. Generally, the discovery rule can apply to negligent misrepresentation claims. First Md. Leasecorp v. Rothstein, 72 Wn. App. 278, 286, 864 P.2d 17 (1993). Therefore, the doctrine of adverse domination also can apply to negligent misrepresentation claims.

Homeowners sufficiently plead concealment with respect to these claims. Homeowners allege that the board members continually ignored the advice of experts, and failed to disclose to the unit owners that they had received such advice. Homeowners also allege that the board members mischaracterized the resealing and caulking efforts as "preventative measures," and that the board members "continued to conceal the severity of the problem from the ownership at large." In fact, Homeowners specifically allege that Philip and "[t]he other Board members [in 2006] cooperated or agreed that the scope of the problem should be

---

[27] Specifically, these claims derive from the allegations that Lozier Homes hired Glenn and instructed her not to perform an intrusive inspection and that Lozier Homes volunteered to conduct a deck inspection.

- 32 -

concealed." Further, the Homeowners allege that the board purposely kept themselves in the dark about the results of an inspection and thereafter withheld the results of the inspection from the Homeowners. As pleaded, the board members continued their concealment until April 24, 2011, when they declared a budget which included the special assessment. Thus, the Homeowners sufficiently allege that the board continued to conceal the facts that established the basis for these claims. As such, the doctrine of adverse domination applies to Homeowners' negligent misrepresentation claims.

Homeowners assert fraud claims against Lozier Homes, Sanford, Burckhard, Sansburn, and Peter. The discovery rule can apply to fraud claims. RCW 4.16.080(4). It is also widely accepted that the doctrine of adverse domination can apply to fraud claims. See, e.g. Grant, 901 P.2d at 815-16.

Homeowners allege that these defendants acted fraudulently in two respects. Homeowners allege that these defendants "breached their duties to plaintiffs to disclose" and "made material misrepresentations . . . of existing facts regarding the presence of defective construction, the cause of water intrusion, the advice of counsel regarding prosecution of a Washington Condominium Act warranty claim, the actual purpose of the 'maintenance' program developed by Lozier, and Glenn's and CCW's lack of qualifications and conflict of interest." Homeowners allege that "the decision to omit these facts [regarding the advice of counsel] from the minutes was part of a deliberate effort on the part of Defendant Peter and/or the other Board members to conceal material information from unit owners." It is unclear from the face of the complaint when the concealment of

- 33 -

this alleged fraudulent act ended. Nonetheless, it is plausible from the face of the complaint that the concealment continued until April 24, 2011. Thus, the doctrine of adverse domination applies to Homeowners' fraud claims.

Finally, Homeowners assert civil conspiracy claims against Lozier Homes and Sanford. As Homeowners implicate only one board member, not a majority, the doctrine of adverse domination does not apply to these claims.

Therefore, with respect to the breach of board member duty of care claims, CPA claims, negligent misrepresentation claims, and fraud by omission and misrepresentation claims, the statute of limitations was presumptively tolled until April 24, 2011. On the face of the complaint, these claims were timely and the trial court erred by dismissing them as a matter of law.

## H

For those claims to which the doctrine of adverse domination does not apply, i.e., Homeowners' negligence and civil conspiracy claims, the discovery rule may still apply.[28] However, Homeowners cannot rely on any presumptions for the application of the rule. As previously noted, "Under the discovery rule, a cause of action accrues when the plaintiff knew or should have known the essential elements of the cause of action." Allen, 118 Wn.2d at 757-58 (footnote omitted). Whether the discovery rule applies to toll the statute of limitations is a question of fact, and can only be decided as a matter of law "if reasonable minds can reach but one conclusion." Allen, 118 Wn.2d at 760.

---

[28] The discovery rule may also apply to claims against Lozier Homes to the extent that it is separately liable for Homeowners' fraud claims.

Pursuant to Homeowners' complaint, it is plausible that Homeowners did not know and could not reasonably have known of the facts underlying their causes of action until April 24, 2011, the date that the Association's board declared a budget that included the repair assessment. The trial court erred by determining that all causes of action accrued against each board member no later than upon the board member's resignation from the board and thus by dismissing all of Homeowners' claims. Whether the discovery rule serves to toll the accrual of Homeowners' negligence and civil conspiracy causes of action presents a question of fact to be decided on remand.

V

A

In the alternative, Respondents contend that Homeowners' claims fail as a matter of law because the board members did not owe a duty to Homeowners. This is so, Respondents assert, because board members owe a duty only to the Association. Respondents further assert that in the event that the board members do owe a duty to unit owners, the duty does not apply to future purchasers.[29] We disagree to the extent that the board members' duties do extend to current unit owners. With respect to future purchasers, however, we agree that the board members owed no duties to future purchasers with respect to Homeowners' claims for breach of the board member duty of care and negligent misrepresentation. Additionally, we hold that Homeowners failed to

---

[29] The trial court properly took judicial notice of Homeowners' deeds, which establish the dates on which each plaintiff purchased his or her unit. Rodriguez v. Loudeye Corp., 144 Wn. App. 709, 725-26, 189 P.3d 168 (2008).

plead the necessary elements of a CPA claim.

In order to establish liability under a tort theory, the plaintiff must prove duty, breach, causation, and damages. Xiao Ping Chen v. City of Seattle, 153 Wn. App. 890, 899, 223 P.3d 1230 (2009). The existence of a duty is a question of law, which we review de novo. Parrilla v. King County, 138 Wn. App. 427, 432, 157 P.3d 879 (2007).

The WCA articulates the nature of the duties owed by an association's board members:

> Except as provided in the declaration, the bylaws, subsection (2) of this section, or other provisions of this chapter, the board of directors shall act in all instances on behalf of the association. In the performance of their duties, the officers and members of the board of directors are required to exercise: (a) If appointed by the declarant, the care required of fiduciaries of the unit owners; or (b) if elected by the unit owners, ordinary and reasonable care.

RCW 64.34.308(1). The statute clearly dictates that the members of the board of directors owe duties to the unit owners when appointed by the declarant. RCW 64.34.308(1)(a); see also Kelsey Lane Homeowners Ass'n v. Kelsey Lane Co., 125 Wn. App. 227, 242-43, 103 P.3d 1256 (2005).

The statute further provides that elected board members owe to unit owners a duty premised upon a lesser standard of care than that applied to those board members who were appointed by the declarant. The statute does not indicate, however, that elected board members owe no duties to unit owners. A homeowners' association "has no life independent of the individual homeowners who are by statute . . . required to be members of the Association." Stuart v. Coldwell Banker Commercial Grp., Inc., 109 Wn.2d 406, 413-14, 745 P.2d 1284

(1987). Thus, by owing duties to the association, the elected board members necessarily owe those same duties to the current unit owners.

Indeed, it would make little sense if the board members owed duties to unit owners if appointed, but no duties to the unit owners if elected. Both sets of directors are tasked with operating the homeowners' association.[30] The directors owe duties to the unit owners as well as the association, regardless of whether they were appointed or elected. It is only the applicable standard of care that differs.

B

Each of the plaintiffs purchased their units on the following dates:[31]

| Cindy Alexander | July 19, 2006 |
| Blocker Ventures, LLC | February 7, 2003 |
| Chris Clark | November 3, 2005 |
| R. Bruce Edgington | April 19, 2006 |
| Kipp and Jennifer Johnson | March 19, 2008 |
| Gopikrishna and Himabindu Kanuri | August 8, 2006 |
| Chris and Elizabeth Kasprzak | September 19, 2002 |
| Paul and Joyce Hyojung Larkins | August 1, 2006 |
| Kristine Magnussen | January 11, 2008 |
| Scott McKillop | September 1, 2005 |

---

[30] Moreover, elected board members can, and in this case did, serve on the board with appointed members.

[31] The dates set forth in the following two tables are garnered from the complaint, the stipulation, and the uncontested public records submitted to the trial court.

| Caine and Dana Ott | July 14, 2006 |
|---|---|
| Mara Patton | August 15, 2007 |
| Peter Richards | September 2, 2009 |
| Dante Schultz | December 14, 2005 |
| Winifred Smith | July 24, 2002 |
| Robert and Colette Stoddard | August 12, 2005 |
| Neil West | May 27, 2004 |
| Liang Xu and Jia Lu Duan | February 6, 2007 |

Each of the defendant-board members left the board on the following dates:

| Gary Sanford | March 24, 2006 |
|---|---|
| Paul Burckhard | May 15, 2001 |
| James Sansburn | May 9, 2002 |
| Richard Peter | May 29, 2003 |
| Shana Holley | May 9, 2002 |
| Brett Backues | January 18, 2004 |
| Joseph Cusimano | June 27, 2006 |
| Patricia Hovda | Unknown date before September 2008 |
| Alexander Philip | July 20, 2006 |

As the above tables demonstrate, a significant number of Homeowners'

claims are asserted against board members who resigned before certain of the plaintiffs purchased their respective units. Thus, Homeowners insist that the board members' duties extend not only to current owners but to future owners as well. Although board members owe duties to current unit owners, it does not necessarily follow that those duties extend to future owners. Homeowners' contention raises two separate questions: (1) Do the appointed board members owe a fiduciary duty to future owners? (2) Do any of the board members owe a freestanding duty of care to future owners independent of their WCA-defined duties to current owners?

A fiduciary relationship can arise either in law or in fact. Liebergesell v. Evans, 93 Wn.2d 881, 890, 613 P.2d 1170 (1980). A fiduciary relationship arises at law when "the nature of the relationship between the parties [is] historically considered fiduciary in character; e.g., trustee and beneficiary, principal and agent, partner and partner, husband and wife, physician and patient, attorney and client." McCutcheon v. Brownfield, 2 Wn. App. 348, 356-57, 467 P.2d 868 (1970); accord Micro Enhancement Int'l, Inc. v. Coopers & Lybrand, LLP, 110 Wn. App. 412, 434, 40 P.3d 1206 (2002). On the other hand, a fiduciary relationship arises in fact when there is "'something in the particular circumstances which approximates a business agency, a professional relationship, or a family tie, something which itself impels or induces the trusting party to relax the care and vigilance which he otherwise should, and ordinarily would, exercise.'" Hood v. Cline, 35 Wn.2d 192, 200, 212 P.2d 110 (1949) (quoting Collins v. Nelson, 193 Wash. 334, 345, 75 P.2d 570 (1938)). "Superior

knowledge and assumption of the role of adviser may contribute to the establishment of a fiduciary relationship." Liebergesell, 93 Wn.2d at 891.

Homeowners contend that the appointed board members owe a fiduciary duty to future unit owners because it is foreseeable that the units will be sold. However, while foreseeability might be sufficient to establish a general tort duty, it is not sufficient to establish a fiduciary duty. Cf. Nguyen v. Doak Homes, Inc., 140 Wn. App. 726, 732-33, 167 P.3d 1162 (2007) (foreseeablility alone not enough to establish duty in fraudulent misrepresentation claim by second purchaser against original seller). The plaintiffs must allege "'something in the particular circumstances which approximates'" a fiduciary relationship. Hood, 35 Wn.2d at 200 (quoting Collins, 193 Wash. at 345). A board member's relationship to an individual who might purchase a unit sometime in the indeterminate future does not approximate a fiduciary relationship. Thus, the appointed board members of a homeowners' association do not owe fiduciary duties to future purchasers.

Accordingly, Homeowners' claims against board members that resigned before certain plaintiffs' units were purchased can survive Respondents' CR 12(b)(6) motions to dismiss only if those board members owe a free-standing duty of care to future owners independent of their WCA-defined duties. On this question, one California case, Frances T. v. Village Green Owners Ass'n, 42 Cal.3d 490, 229 Cal.Rptr. 456, 723 P.2d 573 (1986), is particularly instructive. In Frances T., the plaintiff filed suit against the condominium homeowners' association and the individual members of the board of directors for negligence,

breach of contract, and breach of fiduciary duties after she was raped in her unit. 42 Cal.3d at 495. The Supreme Court of California held that members of the board of directors could be held jointly liable with the corporation on the negligence claim. Frances T., 42 Cal.3d at 503. "Their liability," the court stated, "stems from their own tortious conduct, not from their status as directors or officers of the enterprise." Frances T., 42 Cal.3d at 503. This was so, the court held, because "like any other employee, directors individually owe a duty of care, independent of the corporate entity's own duty, to refrain from acting in a manner that creates an unreasonable risk of personal injury to third parties." Frances T., 42 Cal.3d at 505. The court held, however, that a board member's breach of statutorily-defined duties does not itself warrant separate liability for that board member. The court stated:

> [D]irectors are not personally liable to third persons for negligence amounting merely to a breach of duty the officer owes to the corporation alone. "[T]he act must also constitute a breach of duty owed to the third person. . . . More must be shown than breach of the officer's duty *to his corporation* to impose personal liability *to a third person* upon him." ([United States Liab. Ins. Co. v. Haidinger-Hayes, Inc.,] 1 Cal.3d [586,] 595[, 83 Cal.Rptr. 418, 463 P.2d 770 (1970)], italics in original.) In other words, a distinction must be made between the director's fiduciary duty to the corporation (and its beneficiaries) and the director's ordinary duty to take care not to injure third parties. The former duty is defined by statute, the latter by common law tort principles.

Frances T., 42 Cal.3d at at 505-06 (footnote omitted).

In Frances T., the plaintiff alleged in her complaint that the board members, who possessed knowledge of a recent increase in crime at the complex, created an unreasonably dangerous condition by failing to repair a

hazardous lighting condition within a reasonable period of time and by ordering her to disconnect her exterior lighting. Frances T., 42 Cal.3d at 509-10. The court found that those allegations were sufficient to state a negligence claim against the board members. Frances T., 42 Cal.3d at 509. Specifically, the court held that the board members' duty arose not by statute, but from their knowledge "that a condition or instrumentality under their control posed an unreasonable risk of injury to the plaintiff." Frances T., 42 Cal.3d at 510.

We find the reasoning in Frances T. persuasive. Analyzing Homeowners' claims in the same manner as the Frances T. court, we hold that Homeowners have pleaded an independent duty owed to future unit owners with respect to only some of their claims.

With respect to their claims for breach of board member duty of care, Homeowners allege that the board members "owed plaintiffs a duty of due care in the management and governance of the Association." As this duty is exactly the duty the board members owe under the WCA, Homeowners have not pleaded an independent duty. All board member duty of care claims asserted against board members who left the board before the date of purchase of a particular plaintiff's unit[32] were thus properly dismissed. Each board member duty of care claim that was properly dismissed is indicated in the table below.

---

[32] We use the term "future unit owner" to refer to a plaintiff who purchased a unit after a particular defendant-board member left the board. Thus, certain plaintiffs are "future unit owners" with respect to certain defendants but not as to others. Other plaintiffs are "future unit owners" with respect to all defendant-board members.

| | Sanford | Burckhard | Sansburn | Peter | Holley | Backues | Cusimano | Hovda | Phillip |
|---|---|---|---|---|---|---|---|---|---|
| Alexander | X | X | X | X | X | X | X | | |
| Blocker Ventures | | X | X | | X | | | | |
| Clark | | X | X | X | X | X | | | |
| Edgington | X | X | X | X | X | X | | | |
| Johnson | X | X | X | X | X | X | X | | X |
| Kanuri | X | X | X | X | X | X | X | | X |
| Kasprzak | | X | X | | X | | | | |
| Larkins | X | X | X | X | X | X | X | | X |
| Magnussen | X | X | X | X | X | X | X | | X |
| McKillop | | X | X | X | X | X | | | |
| Ott | X | X | X | X | X | X | X | | |
| Patton | X | X | X | X | X | X | X | | X |
| Richards | X | X | X | X | X | X | X | X | X |
| Schultz | | X | X | X | X | X | | | |
| Smith | | X | X | | X | | | | |
| Stoddard | | X | X | X | X | X | | | |
| West | | X | X | X | X | X | | | |
| Xu | X | X | X | X | X | X | X | | X |

With respect to these claims, Lozier Homes was not a member of the board and could not have owed an independent duty to the plaintiffs. Thus, the board member duty of care claims are only cognizable against Lozier Homes pursuant to a theory of vicarious liability for the actions taken by Sanford, Burckhard, and Sansburn. Claims against Lozier Homes were thus properly dismissed where claims against all three of these individuals were properly dismissed.

With respect to their claims for negligent misrepresentation, Homeowners allege that Lozier Homes, Sanford, Burckhard, and Sansburn breached their duties to "disclose existing material facts" regarding the construction defects, Glenn's lack of credentials, and the advice received from Harer and Jobe. In order to state a claim for negligent misrepresentation, a plaintiff must allege that

"(1) the defendant supplied information for the guidance of others in their business transactions that was false, (2) the defendant knew or should have known that the information was supplied to guide the plaintiff in his business transactions, (3) the defendant was negligent in obtaining or communicating the false information, (4) the plaintiff relied on the false information, (5) the plaintiff's reliance was reasonable, and (6) the false information proximately caused the plaintiff damages."

Austin v. Ettl, 171 Wn. App. 82, 88, 286 P.3d 85 (2012) (quoting Ross v. Kirner, 162 Wn.2d 493, 499, 172 P.3d 701 (2007). Ordinarily, "[a]n omission alone cannot constitute negligent misrepresentation, since the plaintiff must justifiably rely on a misrepresentation." Ross, 162 Wn.2d at 499. "When a duty to disclose does exist, however, the suppression of a material fact is tantamount to an affirmative misrepresentation." Crisman, 85 Wn. App. at 22.

- 44 -

"Ordinarily, the duty to disclose a material fact exists only where there is a fiduciary relationship." Tokarz v. Frontier Fed. Sav. & Loan Ass'n, 33 Wn. App. 456, 463-64, 656 P.2d 1089 (1982) (citing Oates v. Taylor, 31 Wn.2d 898, 903, 199 P.2d 924 (1948)). Outside of a fiduciary relationship, the court will only find a duty to disclose

> where the court can conclude there is a quasi-fiduciary relationship, where a special relationship of trust and confidence has been developed between the parties, where one party is relying upon the superior specialized knowledge and experience of the other, where a seller has knowledge of a material fact not easily discoverable by the buyer, and where there exists a statutory duty to disclose.

Favors v. Matzke, 53 Wn. App. 789, 796, 770 P.2d 686 (1989) (citations omitted). Homeowners do not allege any facts establishing that the relationship between the future unit owners and the board members resembled any one of the relationships listed in Favors.[33] Thus, Homeowners fail to allege that the board members had any duty to disclose *independent of their statutory duties.* Here, all negligent misrepresentation claims asserted by future unit owners were properly

---

[33] Homeowners do not allege that Lozier Homes was ever a member of the board. Homeowners also do not allege that they purchased their units from Lozier Homes. In fact, Homeowners fail to allege any facts establishing that they were in a fiduciary relationship with Lozier Homes or that their relationship to Lozier Homes resembled any one of the relationships listed in Favors. This is true with respect to unit owners as well as future unit owners. Thus, Homeowners fail to plead any negligent misrepresentation claims against Lozier Homes in its individual capacity.

Homeowners do sufficiently allege facts from which we can envision a hypothetical set of facts, consistent with the complaint, establishing that Sanford, Burckhard, and Sansburn were agents of Lozier Homes. Accordingly, Homeowners state negligent misrepresentation claims with respect to Lozier Homes only to the extent that it is vicariously liable for the actions of Sanford, Burckhard, and Sansburn. Negligent misrepresentation claims against Lozier Homes were properly dismissed where claims against all three of these individuals were properly dismissed.

Homeowners also sufficiently allege facts from which we can envision a hypothetical set of facts, consistent with the complaint, establishing that Lozier Homes is the alter ego of Declarant. These claims have been reduced to default judgment against Declarant. Whether Lozier Homes is responsible for liability assigned to Declarant in that judgment is a question beyond the scope of the briefing and argument herein and will need to be addressed upon remand.

dismissed. Each negligent misrepresentation claim that was properly dismissed is marked in the table below.

| | Sanford | Burckhard | Sansburn | Lozier Homes |
|---|---|---|---|---|
| Alexander | X | X | X | X |
| Blocker Ventures | | X | X | |
| Clark | | X | X | |
| Edgington | X | X | X | X |
| Johnson | X | X | X | X |
| Kanuri | X | X | X | X |
| Kasprzak | | X | X | |
| Larkins | X | X | X | X |
| Magnussen | X | X | X | X |
| McKillop | | X | X | |
| Ott | X | X | X | X |
| Patton | X | X | X | X |
| Richards | X | X | X | X |
| Schultz | | X | X | |
| Smith | | X | X | |
| Stoddard | | X | X | |
| West | | X | X | |
| Xu | X | X | X | X |

In addition to their negligent misrepresentation claims, Homeowners also plead claims for fraud by omission and misrepresentation. In order to state a claim for fraud, the plaintiff must establish "(1) representation of an existing fact; (2) materiality; (3) falsity; (4) the speaker's knowledge of its falsity; (5) intent of the speaker that it should be acted upon by the plaintiff; (6) plaintiff's ignorance of its falsity; (7) plaintiff's reliance on the truth of the representation; (8) plaintiff's right to rely upon it; and (9) damages." Stiley v. Block, 130 Wn.2d 486, 505, 925 P.2d 194 (1996). Unlike for negligent misrepresentation claims, for claims of fraud a duty to disclose may exist independent of the board members' statutory duties. In Haberman v. Washington Public Power Supply System, 109 Wn.2d 107, 168, 744 P.2d 1032, 750 P.2d 254 (1987), our Supreme Court stated that "while a duty in a fraud case may be owed by a defendant to plaintiffs in privity, a fiduciary relationship, or a limited class of persons, a duty may also arise to those third persons whom the defendant intends or has reason to expect will receive the information." Haberman, 109 Wn.2d at 168. The court found that this was sound policy because, "while requiring . . . a fiduciary relationship . . . is warranted in negligent misrepresentation cases where a defendant is merely negligent and should not be held potentially liable to an unlimited number of plaintiffs, the same reasoning does not apply where a defendant knowingly makes a misrepresentation." Haberman, 109 Wn.2d at 167. As Homeowners note, it was foreseeable that condominium units would be bought and sold. Because condominium unit sellers have a duty to disclose to purchasers

pursuant to RCW 64.06.020, the board members have reason to expect that the representations they make to owners will be transmitted to purchasers.

This expectation, however, is informed by our decision in Nguyen, wherein we held that the original seller of a home has no duty to disclose a concealed defect to the second purchaser. 140 Wn. App. at 732-33. Whereas the Haberman plaintiffs asserted a claim for fraudulent misrepresentation, the Nguyen plaintiffs asserted a claim for fraudulent concealment. Nguyen, 140 Wn. App. at 729. Viewing Nguyen in light of Haberman, in order for a second purchaser to state a claim for fraud against the original seller, the subsequent purchaser must allege that the original seller made an affirmative misrepresentation; allegations of omissions alone will not suffice. Here, Homeowners allege both omission and misrepresentation. Homeowners allege that they relied on Lozier Homes, Sanford, Burckhard, Sansburn, and Peter, but what actions Homeowners undertook as a result of such reliance is unclear. However, given that Homeowners pleaded that Lozier Homes, Sanford, Burckhard, Sansburn, and Peter made affirmative misrepresentations, we can hypothesize a set of facts that will satisfy the duty requirement set out in Haberman. This is all that is required to survive a CR 12(b)(6) motion. Kinney v. Cook, 159 Wn.2d 837, 842, 154 P.3d 206 (2007). Hence, all plaintiffs sufficiently state a claim for fraud against Lozier Homes, Sanford, Burckhard, Sansburn, and Peter.

Finally, Homeowners assert a civil conspiracy claim against Lozier Homes and Sanford. In order to establish a civil conspiracy, a plaintiff

must prove by clear, cogent, and convincing evidence that (1) two or more people combined to accomplish an unlawful purpose, or combined to accomplish a lawful purpose by unlawful means; and (2) the conspirators entered into an agreement to accomplish the conspiracy. Wilson v. State, 84 Wn. App. 332, 350–51, 929 P.2d 448 (1996), cert. denied, 522 U.S. 949[, 118 S.Ct. 368, 139 L.Ed.2d 286] (1997).

All Star Gas, Inc. of Wash. v. Bechard, 100 Wn. App. 732, 740, 998 P.2d 367 (2000). Homeowners allege that Lozier Homes and Sanford conspired to

breach[ ] their fiduciary duties to unit purchasers, fraudulently conceal[ ] the existence of defective construction, pretend[ ] to do comprehensive investigation and repair of conditions with knowledge that the investigations and repairs were not adequate, misrepresent[ ] the nature and cause of the leaks being experienced by unit owners, plac[e] Sanford on the Board when he had no legal right under the Washington Condominium Act to remain, and other actions.

Homeowners allege, in other words, that Lozier Homes and Sanford conspired to commit the torts that formed the basis for their other claims. Homeowners' civil conspiracy claims thus incorporate all of Homeowners' other claims. As previously noted, a duty can arise to third persons where the defendant fraudulently misrepresents a material fact. Because the civil conspiracy claims incorporate Homeowners' fraud claims, Homeowners sufficiently allege a duty on behalf of Sanford independent of his duties as a board member. Homeowners' civil conspiracy claims therefore survive Respondents' CR 12(b)(6) objections.[34]

---

[34] Lozier Homes and Sanford further contend that Homeowners' civil conspiracy claims fail because an agent cannot conspire with its principal. However, from Homeowners' complaint, we can hypothesize a set of facts in which Sanford was not acting as the agent of Lozier Homes during the conspiracy. Conflicting theories of liability can be resolved on remand by the application of actual evidentiary facts, as opposed to our application of the CR 12(b)(6) standard of review.

- 49 -

C

Homeowners fail to properly plead their CPA claims. In order to prevail on a claim for violation of the CPA, the plaintiff must establish "(1) an unfair or deceptive act or practice (2) occurring in trade or commerce (3) with a public interest impact (4) that proximately causes [and] (5) injury to a plaintiff in his or her business or property." Douglas v. Visser, 173 Wn. App. 823, 834, 295 P.3d 800 (2013) (citing Svendsen v. Stock, 143 Wn.2d 546, 553, 23 P.3d 455 (2001); Indoor Billboard/Wash., Inc. v. Integra Telecom of Wash., Inc., 162 Wn.2d 59, 83-84, 170 P.3d 10 (2007)).

Homeowners allege that Lozier Homes, Sanford, Burckhard, and Sansburn, took various actions "[i]n order to protect themselves from potential liability under the implied warranties of quality of the Washington Condominium Act for selling seriously defective construction at the Project." However, none of the plaintiffs purchased their units from Lozier Homes, Sanford, Burckhard, or Sansburn.[35] Lozier Homes, Sanford, Burckhard, and Sansburn, were not in the business of selling condominiums. When Homeowners purchased their units, they were not engaged in trade or commerce with Lozier Homes, Sanford, Burckhard, or Sansburn. As they do not allege that Lozier Homes', Sanford's, Burckhard's, and Sansburn's actions occurred in trade or commerce,

---

[35] Smith and Kasprzak purchased their units from Declarant. Thus, Smith and Kasprzak stated a CPA claim against Declarant. These claims were reduced to default judgment against Declarant. These plaintiffs set forth no facts establishing Lozier Homes' individual liability on this claim. Whether Lozier Homes is the alter ego of Declarant, and thus responsible for the judgment entered against it, presents a separate question.

Homeowners fail to state a claim for violation of the CPA. Accordingly, all of Homeowners' CPA claims were properly dismissed.[36]

## VI

Although not addressed by the trial court, Respondents contend that the naming of spouses as codefendants is not necessary to create community liability and, therefore, the spouses of the individual board members are not proper parties to the suit.[37] Respondents cite no authority that prohibits the naming of spouses as codefendants in a complaint, nor could they, as such a rule does not exist. It was not improper for Homeowners to name the board members' spouses as parties in their complaint.

## VII

### A

In their cross appeal, Sanford, Burckhard, Sansburn, and Lozier Homes contend that the trial court erred by denying their request for attorney fees

---

[36] Lozier Homes makes two brief contentions as to why Homeowners' negligence claims fail, neither of which is availing. First, Lozier Homes contends that the allegations that it offered to perform deck inspections and that it recoated the decks is not sufficient to establish a duty. "[I]f someone gratuitously undertakes to perform a duty, they can be held liable for performing it negligently." Burg v. Shannon & Wilson, Inc., 110 Wn. App. 798, 808, 43 P.3d 526 (2002). It is conceivable based on Homeowners' complaint that Lozier Homes voluntarily undertook a deck project and completed it negligently. Accordingly, Lozier Homes' argument is better suited to a motion for summary judgment, not a CR 12(b)(6) motion.

Second, Lozier Homes contends that Homeowners' negligence claims fail because there is no such thing as a claim for negligent construction. This contention fails regardless of the accuracy of Lozier Homes' characterization of the law. Homeowners' claims are for negligence "in undertaking the construction, inspection, condition reporting, and repair of the Project." (Emphasis added.) Homeowners' negligence claims thus are not merely for negligent construction.

[37] The only case cited by Respondents, deElche v. Jacobsen, 95 Wn.2d 237, 622 P.2d 835 (1980), does not stand for this proposition. The court in deElche held that in cases of separate liability, a plaintiff may recover from the defendant's community property if the defendant's separate property is insufficient to satisfy the judgment. 95 Wn.2d at 246.

pursuant to RCW 4.84.185. This is so, they assert, because Homeowners' complaint was clearly frivolous, as Homeowners knew that the statutory limitation periods on their claims had long since expired. Our resolution of the issues in this appeal belies that assertion.

RCW 4.84.185 reads, in pertinent part, "In any civil action, the court . . . may, upon written findings by the judge that the action . . . was frivolous and advanced without reasonable cause, require the nonprevailing party to pay the prevailing party the reasonable expenses, including fees of attorneys, incurred in opposing such action." We review a trial court's decision under RCW 4.84.185 for an abuse of discretion. Rhinehart v. Seattle Times, 59 Wn. App. 332, 339-40, 798 P.2d 1155 (1990). "A frivolous action is one that cannot be supported by any rational argument on the law or facts." Rhinehart, 59 Wn. App. at 340. In order for the court to award attorney fees under RCW 4.84.185, the lawsuit must be frivolous in its entirety and "advanced without reasonable cause." N. Coast Elec. Co. v. Selig, 136 Wn. App. 636, 650, 151 P.3d 211 (2007). As some of Homeowners' claims should have survived Respondents' CR 12(b)(6) motions to dismiss, Homeowners' lawsuit was clearly not frivolous in its entirety. The trial court did not err by denying the request for an award of attorney fees.

B

Sanford, Burckhard, Sansburn, and Lozier Homes also request attorney fees on appeal pursuant to RAP 18.9(a).[38] Homeowners' appeal is frivolous,

---

[38] RAP 18.9(a) states:

they assert, because Homeowners' underlying claim was frivolous and Homeowners make no new arguments on appeal. "An appeal is frivolous if 'no debatable issues are presented upon which reasonable minds might differ, *i.e.*, it is devoid of merit that no reasonable possibility of reversal exists.'" Hartford Ins. Co. v. Ohio Cas. Ins. Co., 145 Wn. App. 765, 780, 189 P.3d 195 (2008) (internal quotation marks omitted) (quoting Olson v. City of Bellevue, 93 Wn.App. 154, 165, 968 P.2d 894 (1998)). As we reverse the trial court's decision with respect to some claims, Homeowners' appeal is not devoid of merit. The request is denied.

## VIII

The decision of the trial court is reversed and remanded for further proceedings with respect to the following claims: all negligence claims against Lozier Homes; all civil conspiracy claims against Lozier Homes and Sanford; all fraud claims against Lozier Homes, Sanford, Burckhard, Sansburn, and Peter; all board member duty of care claims marked in the following chart,

| | Sanford | Peter | Backues | Cusimano | Hovda | Phillip | Lozier Homes |
|---|---|---|---|---|---|---|---|
| Alexander | | | | | X | X | |

The appellate court on its own initiative or on motion of a party may order a party or counsel, or a court reporter or other authorized person preparing a verbatim report of proceedings, who uses these rules for the purpose of delay, files a frivolous appeal, or fails to comply with these rules to pay terms or compensatory damages to any other party who has been harmed by the delay or the failure to comply or to pay sanctions to the court. The appellate court may condition a party's right to participate further in the review on compliance with terms of an order or ruling including payment of an award which is ordered paid by the party. If an award is not paid within the time specified by the court, the appellate court will transmit the award to the superior court of the county where the case arose and direct the entry of a judgment in accordance with the award.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Blocker Ventures | X | X | X | X | X | X | X |
| Clark | X | | | X | X | X | X |
| Edgington | | | | X | X | X | |
| Johnson | | | | | X | | |
| Kanuri | | | | | X | | |
| Kasprzak | X | X | X | X | X | X | X |
| Larkins | | | | | X | | |
| Magnussen | | | | | X | | |
| McKillop | X | | | X | X | X | X |
| Ott | | | | | X | X | |
| Patton | | | | | X | | |
| Schultz | X | | | X | X | X | X |
| Smith | X | X | X | X | X | X | X |
| Stoddard | X | | | X | X | X | X |
| West | X | | | X | X | X | X |
| Xu | | | | | X | | |

and all negligent misrepresentation claims marked in the following chart.

| | Sanford | Burckhard | Sansburn | Lozier Homes |
|---|---|---|---|---|
| Alexander | | | | |
| Blocker Ventures | X | | | X |

| | | | | |
|---|---|---|---|---|
| Clark | X | | | X |
| Edgington | | | | |
| Johnson | | | | |
| Kanuri | | | | |
| Kasprzak | X | | | X |
| Larkins | | | | |
| Magnussen | | | | |
| McKillop | X | | | X |
| Ott | | | | |
| Patton | | | | |
| Richards | | | | |
| Schultz | X | | | X |
| Smith | X | | | X |
| Stoddard | X | | | X |
| West | X | | | X |
| Xu | | | | |

The decision of the trial court is affirmed in all other respects.

Affirmed in part, reversed in part.

We concur: