IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

TULALIP TRIBES OF WASHINGTON,
federally recognized Indian Tribes and
TULALIP GAMING ORGANIZATION,
an instrumentality and enterprise of
Tulalip Tribes of Washington,

                Appellants,

       v.

LEXINGTON INSURANCE
COMPANY; ALLIANT SPECIALTY
INSURANCE SERVICES, INC., and
ALLIANT INSURANCE SERVICES,
INC., d/b/a TRIBAL FIRST,

                Respondents,

SUBSCRIBING UNDERWRITERS AT
LLOYD'S-SYNDICATES: ASC 1414,
XLC 2003, TAL 1183, MSP 318, ATL
1861, KLN 510, AGR 3268;
UNDERWRITERS AT LLOYD'S
SYNDICATE: CNP4444;
UNDERWRITERS AT LLOYD'S -
ASPEN SPECIAL TY INSURANCE
COMPANY; HOMELAND INSURANCE
COMPANY OF NY (ONE BEACON);
HALLMARK SPECIALTY INSURANCE
COMPANY; UNDERWRITERS AT
LLOYD'S SYNDICATES: KLN 0510,
ATL 1861, ASC 1414, QBE 1886, MSP
0318, APL 1969, CHN 2015, XLC
2003; UNDERWRITERS AT LLOYD'S
- SYNDICATE: BRT 2987;
ENDURANCE WORLDWIDE
INSURANCE LTD t/as SOMPO
INTERNATIONAL; UNDERWRITERS
AT LLOYD'S-SYNDICATES: KLN

No. 86115-8-I

DIVISION ONE

PUBLISHED OPINION

0510, TMK 1880, BRT 2987, BRT 2988, CNP 4444, ATL 1861, NEON WORLDWIDE PROPERTY CONSORTIUM, AUW 0609, TAL 1183, AUL 1274; ARCH SPECIALTY INSURANCE COMPANY; EVANSTON INSURANCE COMPANY; ALLIED WORLD NATIONAL ASSURANCE COMPANY; and LIBERTY MUTUAL FIRE INSURANCE COMPANY,

Defendants.

CHUNG, J. — The Tulalip Tribes of Washington maintained "All Risk" insurance coverage for its businesses. The Tulalip Tribes sought coverage after government orders relating to COVID-19 required temporary closures of their businesses, causing significant monetary losses. The relevant policy provisions predicated coverage on "direct physical loss or damage." After the insurers denied coverage the Tribes sued. Defendants filed CR 12(b)(6) motions claiming COVID-19 cannot cause direct physical loss or damage. The court granted the motions, and the Tribes appealed. We hold that the Tribes failed to state a claim that COVID-19 caused "direct physical loss or damage" to its properties. Therefore, we affirm the dismissal of their Complaint.

FACTS

The Tulalip Tribes of Washington (TTW) are a federally recognized Indian tribe, and the Tulalip Gaming Organization (TGO) is the Tribes' corporate arm, which operates businesses, including casinos, in Tulalip, Washington. In early 2020, state, local, and tribal governments across the country ordered businesses to suspend or limit their operations in an effort to slow the spread of COVID-19.

2

TTW did the same, issuing an "Emergency Order; Stay Home & Stay Healthy," requiring "residents and others who visit or recreate within the boundaries of the Tulalip Reservation" to stay home except for certain essential activities effective March 26, 2020. Due to these temporary closures, TTW and TGO (collectively, "the Tribes") lost business income.

On May 5, 2020, on behalf of the business interests of TGO, the Tribes submitted a claim under their commercial property insurance policies from Lexington Insurance Company and various other excess insurers (collectively, Insurers),[1] purchased through the Tribal First Insurance Program. The policies at issue here were "All Risk" insurance policies ("Policies") for the period July 1, 2019, through July 1, 2020. The "Perils Covered" provision states that "[s]ubject to the terms, conditions and exclusions stated elsewhere herein, this Policy provides insurance against all risk of direct physical loss or damage occurring during the period of this Policy." During the applicable period, the Policies did not contain a virus exclusion.

Before the investigations of the Tribes' claims were complete, on July 2020, the Tribes sued the Insurers for coverage under the Policies, as well as for breach of the duty of good faith and fair dealing and violations of the Washington Consumer Protection Act (CPA), ch. 19.86 RCW, and the Washington Insurance

---

[1] The insurer Respondents are Lexington Insurance Company, Aspen Specialty Insurance Company, Aspen Insurance UK, LTD, and Hallmark Specialty Insurance Co., Allied World National Assurance Co. Arch Specialty Ins. Co., Homeland Ins. Co. of New York, Allied World National Assurance Co., Arch Specialty Ins. Co. and Homeland Insurance Co., Certain Underwriters at Lloyd's, London, and Certain London Market Insurance Companies; Endurance Worldwide Insurance Limited, and Evanston Insurance Co.

Fair Conduct Act (IFCA), RCW 48.30.010-.015. The Insurers later denied the Tribes' coverage claims.

The parties agreed to stay the case pending the Washington Supreme Court's decision in Hill & Stout, PLLC v. Mutual of Enumclaw Ins. Co., which addressed the issue of insurance coverage for business interruption losses arising out of COVID-19. 200 Wn.2d 208, 515 P.3d 525 (2022). Thereafter, in July 2023, the Tulalip Tribes filed their Third Amended Complaint ("Complaint").

In August 2023, defendant Lexington Insurance Company filed a CR 12(b)(6) motion to dismiss the Tribes' Complaint, joined by the other defendants, except for Alliant, which disputed its characterization as an insurer. Alliant separately filed a motion to dismiss, but on nearly identical grounds as in Lexington's motion to dismiss.

In fall 2023, the trial court granted Lexington's and Alliant's motions, dismissing the claims against them and the other Insurers. The court agreed with the Insurers that COVID-19 does not cause "direct physical loss or damage" to property as contemplated under the Tribes' Policies. While the court recognized that the virus clearly impacts people, in its oral ruling, it explained that there was nothing within the Complaint—even when everything is taken as true—that showed COVID-19 caused "direct physical damage, that doesn't dissipate, that is permanent in nature" to the covered properties, which is necessary to trigger coverage.

The Tribes timely appealed.[2] United Policyholders submitted an amicus brief supporting the Insurers.

## DISCUSSION

On appeal, the Tribes contend they have pleaded sufficient facts to show that they could be entitled to coverage for damages caused by COVID-19. The Respondent Insurers maintain that COVID-19 does not cause a "direct physical loss or damage" to property.[3] We agree with the Insurers.

### A.     Standard of Review

This court applies the de novo standard of review to a trial court's decision to dismiss pursuant to CR 12(b)(6). FutureSelect Portfolio Mgmt., Inc. v. Tremont Grp. Holdings, Inc., 175 Wn. App. 840, 865, 309 P.3d 555 (2013). A defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." CR 12(b)(6). A CR 12(b)(6) motion "questions only the legal sufficiency of the allegations in a pleading, asking whether there is an insuperable bar to relief." Alexander v. Sanford, 181 Wn. App. 135, 142, 325 P.3d 341 (2014).

When deciding a CR 12(b)(6) motion, the court should regard the plaintiff's allegations in the Complaint as true and consider hypothetical facts outside the

---

[2] Although Alliant filed a response to the appeal, it primarily maintains its previous argument—that it is not an insurer but a policy administrator—and otherwise relies on Lexington's briefing for the substantive arguments.

[3] Lexington's brief contains the substantive coverage arguments. All involved insurers joined Lexington's response brief, except for Alliant. Alliant did file a separate brief to maintain its argument at the trial court, i.e., it does not qualify as an insurer with respect to the relevant policies of insurance or is an agent on behalf of such an insurer, even though it recognizes that in the current posture of a CR 12(b)(6) motion, all facts alleged in the Complaint are true. Otherwise, it refers this court to Lexington's brief for the substantive arguments regarding coverage. Thus, for purposes of this appeal, we include Alliant among the collective Respondent Insurers.

record. Id. at 865 (citing Burton v. Lehman, 153 Wn.2d 416, 422, 103 P.3d 1230 (2005)). Motions to dismiss brought under CR 12(b)(6) "should be granted only 'sparingly and with care.' " Bravo v. Dolsen Companies, 125 Wn.2d 745, 750, 888 P.2d 147 (1995) (quoting Haberman v. WPPSS, 109 Wn.2d 107, 120, 744 P.2d 1032 (1987)). "A CR 12(b)(6) motion may be granted only where there is not only an absence of facts set out in the Complaint to support a claim of relief, but there is no hypothetical set of facts that could conceivably be raised by the Complaint to support a legally sufficient claim." Worthington v. Westnet, 182 Wn.2d 500, 505, 341 P.3d 995 (2015).

B.      Principles of Insurance Contract Interpretation

Under Washington law, "[c]onstruction of an insurance policy is a question of law for the courts, the policy is construed as a whole, and the policy 'should be given a fair, reasonable, and sensible construction as would be given to the contract by the average person purchasing insurance.' " Queen Anne Park Homeowners Ass'n v. State Farm Fire & Cas. Co., 183 Wn.2d 485, 489, 352 P.3d 790 (2015) (quoting Queen City Farms, Inc. v. Cent. Nat'l Ins. Co. of Omaha, 126 Wn.2d 50, 65, 882 P.2d 703 (1994)). We liberally construe insurance policies whenever possible. Bordeaux, Inc. v. Am. Safety Ins. Co., 145 Wn. App. 687, 694, 186 P.3d 1188 (2008). That said, the insured bears the burden of showing that coverage exists, while the insurer bears the burden of showing that an exclusion applies. Mut. of Enumclaw Ins. Co. v. T&G Constr., Inc., 165 Wn.2d 255, 268, 199 P.3d 376 (2008). Further, "[i]n construing the language of an insurance policy, the entire contract must be construed together

6

so as to give force and effect to each clause." Boeing Co. v. Aetna Cas. & Sur. Co., 113 Wn.2d 869, 876, 784 P.2d 507 (1990).

" 'Undefined terms are to be given their plain, ordinary, and popular meaning.' " Xia v. ProBuilders Specialty Ins. Co., 188 Wn.2d 171, 181-82, 400 P.3d 1234 (2017) (quoting Key Tronic Corp. v. Aetna (CIGNA) Fire Underwriters Ins. Co., 124 Wn.2d 618, 627, 881 P.2d 201 (1994)). Where the language of a policy is clear and unambiguous, the court "must enforce [the policy] as written and may not modify [the policy] or create ambiguity where none exists." Pub. Util. Dist. No. 1 of Klickitat County v. Int'l Ins. Co., 124 Wn.2d 789, 797, 881 P.2d 1020 (1994). A term is considered ambiguous only "when, on its face, it is fairly susceptible to two different interpretations, both of which are reasonable." Am. Nat'l Fire Ins. Co. v. B&L Trucking & Constr. Co., 134 Wn.2d 413, 428, 951 P.2d 250 (1998). If an undefined term is ambiguous, it "must be construed against the insurer and in favor of the insured." Holden v. Farmers Ins. Co. of Wash., 169 Wn.2d 750, 756, 239 P.3d 344 (2010).

C.    Definition of "Direct Physical Loss or Damage"

The policy provisions at issue provide coverage for "direct physical loss or damage" to covered property. Thus, the primary issue is the interpretation of the phrase "direct physical loss or damage." The Tribes note the Policies neither define "physical loss or damage," nor define "loss" or "damage" in isolation, and none of the Policies requires that "direct physical loss" involve structural damage to insured properties. The Insurers counter that the Washington Supreme Court made clear in Hill & Stout that the plain language interpretation of "physical loss

or damage" necessitates " 'some external physical force that causes direct physical change to the properties.' " 200 Wn.2d at 219 (quoting trial court opinion granting summary judgment).

The Policies at issue here insure against "perils covered," which are defined as "all risk of direct physical loss or damage," subject to the Policy's "terms, conditions and exclusions." The Policies also provide coverage for business interruption and insure

> Against loss resulting directly from interruption of business, services or rental value *caused by direct physical loss or damage*, as covered by this Policy *to real and/or personal property* insured by this Policy, occurring during the term of this Policy.
> (Emphasis added.)

Finally, the Tribes point to other specific "Extensions of Coverage" provisions that they allege are relevant here, all of which are also subject to the requirement of "direct physical loss or damage" to property. For example, these provisions include an "Extra Expense" provision covering "damage to or destruction of covered property by a covered peril"; an "Ingress/Egress" provision covering "physical loss or damage caused by a covered peril(s)" that "directl[ly] result[s]" in "ingress to or egress from the covered property. . . [being] prevented"; and an "Interruption by Civil Authority" provision covering "damage to or destruction of property by a covered peril(s)" that "direct[ly] result[s]" in "access to the covered property [being] specifically prohibited by order of a civil authority."

The terms "direct physical loss or damage" and "real and/or personal property" are undefined in the Policies, so the court may look to dictionary definitions. Kut Suen Lui v. Essex Ins. Co., 185 Wn.2d 703, 713, 375 P.3d 596

8

(2016) (in determining plain language meaning, the court may reference standard English language dictionaries). In Hill & Stout, as here, the primary issue was the interpretation of the phrase "direct physical loss of or damage to Covered Property." 200 Wn.2d at 219. There, plaintiff Hill & Stout, a dental practice, sought coverage for losses and expenses resulting from business interruption based on the Governor's COVID-19 proclamations limiting the practice of dentistry to emergency procedures. Id. at 215. The defendant insurers argued that the proclamation did not result in loss of or damage to the covered property and that the virus exclusion in the policies at issue excluded coverage. Id. As "direct physical loss" was not defined in the policies, the court looked to the dictionary definitions:

> "Physical" is defined as "of or belonging to all created existences in nature" and "of or relating to natural or material things as opposed to things mental, moral, spiritual, or imaginary." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1706 (2002). "Loss" is defined most pertinently as "the act or fact of losing : failure to keep possession . . . "

Id. at 219. The court then reasoned, "It follows that a 'physical loss of . . . property' is a property that has been physically destroyed or that one is deprived of in that the property is no longer physically in their possession." Id. The court rejected Hill & Stout's interpretation that because "it was physically *deprived* of the use of its business property as an immediate result of Governor Inslee's proclamations," there was a direct physical loss, or deprivation, of its property. Id. at 220. Instead, the court concluded, "under the facts of this case we hold that the claim for loss of intended use and loss of business income is not a *physical* loss of property. Hill & Stout was still able to *physically* use the property at

issue. . . . Hill & Stout was not able to use the property in the way that it wanted, but this alleged 'loss' is not 'physical.' " Id. at 220. "It is more akin to an abstract or intangible loss than a 'physical' one." Id.

The court also declined Hill & Stout's invitation to apply a "loss of functionality test" instead of requiring physical alteration to the property:

> [While] there are likely cases in which there is no physical *alteration* to the property but there is a direct physical loss under a theory of loss of functionality . . . this case is not one of them. Under a loss of functionality test, [Hill & Stout]'s claim also fails because there is no *physical* loss of functionality to the *property*. . . . [I]n this case, there was no alleged imminent danger to the property, no contamination with a problematic substance, and nothing that *physically* prevented use of the property or rendered it useless; nor were the dental offices rendered unsafe or uninhabitable because of a dangerous physical condition.

Id. at 221-22. Reviewing other Washington cases involving policies covering physical loss of or damage to property, the court noted that while not in the COVID-19 context, the cases held that "something *physically* must happen to the property." Id. at 222.[4] The court also reasoned that this understanding of " 'direct physical loss' is consistent with other provisions in the policy." Id. at 224.

In this case, as in Hill & Stout, the Policies specify that under a claim for lost business income due to business interruption, the insurer will be liable for the actual loss and rental value sustained by the insured, minus charges and

---

[4] In so holding, our Supreme Court referenced a recent federal trial court's decision addressing "direct physical loss" required for coverage for COVID-19, stating, "We agree with Judge Rothstein's conclusion as to 'direct physical loss.' While there may be some flexibility to a physical alteration requirement under a loss of functionality test, even under a loss of functionality test there must be some *physical* effect on the property that is not found in the present case." Hill & Stout, 200 Wn. 2d at 223-24 (citing Nguyen v. Travelers Cas. Ins. Co. of Am., 541 F. Supp. 3d 1200 (W.D. Wash. 2021)).

expenses that do not necessarily continue during the "period of restoration."[5] Because Hill & Stout concluded that the language "direct physical loss or damage" requires a direct physical effect on the property, we next address whether the Tribes have sufficiently pleaded such a physical effect by COVID-19 to survive the CR 12(b)(6) motion to dismiss.[6]

### D. Direct Physical Loss from COVID-19

The Tribes argue that a "direct physical loss" need not involve structural damage to insured parties, and the presence of COVID-19 itself can cause physical alteration to a property that is a covered physical loss of or damage to the property.[7] As the Tribes correctly note, in Hill & Stout, the court expressly

---

[5] The Policies define a period of restoration as follows:

The period during which business interruption and or rental interruption applies will begin on the date direct physical loss occurs and interrupts normal business operations and ends on the date that the damaged property should have been repaired, rebuilt or replaced with due diligence and dispatch, but not limited by the expiration of this policy.

[6] The Tribes argue the lack of a virus exclusion within their Policies is relevant to determining whether there was an implied coverage for viruses, noting that prior to 2017 and after July 2020, the TPIP policy explicitly excluded microorganisms, including human pathogens such as viruses, as a covered cause of loss or damage. Thus, they contend, the fact that there was no exclusion from 2017 to 2020 is relevant in construing the insurance policies, citing the "context rule" for interpreting contracts, which states that "extrinsic evidence is admissible as to the entire circumstances under which the contract was made, as an aid in ascertaining the parties' intent." Berg v. Hudesman, 115 Wn.2d 657, 667, 801 P.2d 222 (1990). However, "when interpreting contracts, the subjective intent of the parties is generally irrelevant if the intent can be determined from the actual words used." Hearst Comm'c'ns Inc. v. Seattle Times Co., 154 Wn.2d 493, 503-04, 115 P.3d 262 (2005).
Here, because the plain meaning of "direct physical loss or damage" is sufficiently clear, we decline to consider extrinsic evidence concerning the party's subjective intent regarding the presence or lack of a virus exclusion in the policy. We also note that the court in Hill & Stout did not consider the virus exclusion necessary to the analysis of the "direct physical loss or damage" policy language. 200 Wn.2d at 225 ("Although we need not examine the issue of . . . the virus exclusion in this case given our resolution as to the first issue, because . . . this issue will likely repeat in other cases . . . we address the issue of the virus exclusion.").
[7] The Tribes further request this court take judicial notice under ER 201 of an order in another King County Superior Court case denying a CR 12(b)(6) motion, concluding the plaintiff's Complaint contained scientific data sufficient to survive a motion to dismiss. We decline the request.

declined to address "whether the presence of COVID-19 itself can cause physical alteration to a property such that the *virus* causes physical loss of or damage to the property. . . . Because [the insured] is not bringing its insurance claim under this theory of coverage we decline to consider this issue." 200 Wn.2d at 217 n.4. The Insurers nevertheless argue this claim is foreclosed by Hill & Stout, because even under a theory of the loss of functionality, property policies of this nature require that "something physically happen" to property. The Insurers argue that because COVID-19 does not physically harm or destroy property and dissipates on its own without requiring any repair, rebuilding, or replacement, as a matter of law, the Tribes' Complaint does not allege facts sufficient to satisfy the Policies' requirement of "direct physical loss or damage."

The Tribes argue they have alleged the required "direct physical loss" in several ways. First, the Tribes allege

> the COVID-19 virus caused direct physical damage to plaintiffs' insured property by transforming physical objects, materials, or surfaces into "fomites." Because the COVID-19 virus can be spread by touching contaminated surfaces, fomites transform objects, materials, and/or surfaces and rendered such objects, materials, and/or surfaces at plaintiffs' insured property unsafe for their intended purpose.

In support of the fomite theory, the Tribes highlight statistical modeling data based on the known incidences of infection and other information generally used in epidemiology.[8] Although testing was limited during the beginning of the pandemic, local positivity rates demonstrated the pervasiveness of the COVID-19 virus throughout the counties and areas where plaintiffs' business properties are

---

[8] Because the current posture on review is a CR 12(b)(6) motion, we recite the facts as alleged in the Complaint.

located. In addition to the statistical data, the Tribes assert they confirmed the presence of COVID-19 at their insured properties.

The Tribes' Complaint includes information about the risk of COVID-19, its properties, and its ability to transmit from person to person and from persons to surfaces and vice versa. According to the Complaint, "the [COVID]-19 virus may also be transmitted to people from physical objects, materials, or surfaces." " 'Fomites' are physical objects or materials that carry, and are capable of transmitting infectious agents, altering these objects to become vectors of disease." The Tribes cite multiple studies that posit that human coronaviruses are able to survive on inanimate surfaces including glass, steel, vinyl, plastic, and paper for long periods of time, up to 9 days. Fomites thus facilitate surface to person transmission because "[p]eople may also become infected when touching their eyes, nose, or mouth after touching surfaces or objects that have been contaminated by the virus." Fomite transmission as a mode of virus transmission is "highly efficient for viruses, both from object-to-hand and from hand-to-mouth."

Further, the Tribes allege that because "the presence of the COVID-19 virus physically transformed the content of the air in any insured location where it was present, rendering the air unsafe for individuals to breathe." the Tribes assert that:

> Given the ubiquity and pervasiveness of the [COVID]-19 virus, no amount of cleaning or ventilation intervention will prevent a person infected and contagious with the [COVID]-19 virus from entering an indoor space and exhaling millions of additional [COVID]-19 virus particles into the air, further: (a) filling the air with aerosolized [COVID]-19 virus that can be inhaled, sometimes with deadly consequences; and (b) depositing [COVID]-19 virus

13

particles on the surfaces, physically altering and transforming those surfaces into disease-transmitting fomites.

To the extent the Tribes argue they were unable to use their property for its intended and covered use, like the insured in Hill & Stout, the Tribes maintained possession of the property, the property was still functional and able to be used, and the Tribes were not prevented from entering the property. 200 Wn.2d at 220. The Tribes resumed operations during the pandemic and acknowledged that they used their properties despite being directly aware the risk of COVID-19 remained. As in Hill & Stout, the deprivation the Tribes experienced is more akin to an abstract or intangible loss, which is insufficient to establish direct physical loss or damage. Id. Indeed, the Washington Supreme Court emphasized that the loss of an insured's desired use of property, absent a physical event impacting the property, is inadequate. Id.[9]

---

[9] The Tribes rely on a recently published opinion from the Supreme Court of North Carolina, North State Deli, LLC v. Cincinnati Ins. Co., 908 S.E.2d 802, 813 (2024), (hereinafter NSD), to argue the decision supports its contention that "direct physical loss" may encompass when insureds were required to suspend business operations due to the COVID-19 pandemic. NSD considered whether "direct physical loss" occurred when government orders forced temporary restrictions on the use of and access to bars and restaurants in North Carolina. Id. at 805. The court held that according to its caselaw concerning insurance policy interpretation, a reasonable person in the position of the insured would "understand the restaurants' policies to include coverage for business income lost when virus-related government orders deprived the policyholder restaurants of their ability to physically use and physically operate property at their insured business premises." Id. at 812. It reasoned, among other things, that the definition of "direct physical loss" was not "entirely insensitive to the 'use' for which a property is insured." Id. at 810. Thus, it determined that when restaurants "lost physical use of their properties as restaurants due to the pandemic orders, they experienced a direct physical loss." Id.

The Tribes' reliance is misplaced for two reasons. First, Hill & Stout established that a government order alone is insufficient to qualify as a "direct physical loss of or damage to property." 200 Wn.2d at 225 ("The average person purchasing a property insurance policy would take ['direct physical loss of . . . property] to mean that the property must be directly physically lost to trigger coverage."). Second, at least a portion of the analysis is dependent on the extrinsic evidence—the existence of virus exclusions in other policies—to determine the scope of risks the policyholder reasonably expected to be covered. North State Deli, LLC, 908 S.E.2d at 812. However, this is contrary to Washington law, which requires enforcement of unambiguous policy language and allows consideration of extrinsic evidence only if the court first finds that "there is an ambiguity." Kitsap County v. Allstate Ins. Co., 136 Wn.2d 567, 576, 964 P.2d 1173 (1998).

14

The Tribes rely on Seattle Tunnel Partners v. Great Lakes Reinsurance (UK) PLC, stating that the opinion clarified that "direct physical loss or damage" can refer to a "deprivation or dispossession of or injury to the insured property." 200 Wn.2d 315, 339, 516 P.3d 796 (2022). But under Seattle Tunnel Partners, the deprivation must still be caused by a physical impact to the property. Id. In that case, the insured suffered losses when its tunnel-boring machine stopped working and temporarily paused the insured's tunnel excavation project. Id. at 319. The insured claimed it was covered under a provision for "direct physical loss, damage, or destruction" because it "suffered direct physical loss" of the "tunneling works"—the tunnel itself, plus the machine used to excavate it—as it was unable to use them and, thus, could not complete construction. Id. at 338. The insured additionally argued that the definition of "loss" encompasses a deprivation that does not necessarily require physical harm to the insured property. Id. at 339. In rejecting the claim, our Supreme Court explained that while "direct physical loss [or] . . . damage" may include the "deprivation or dispossession of or injury to the insured property," such "deprivation, dispossession, or injury must be physical." Id. It reasoned that while "loss" has many definitions, including deprivation, the phrase "loss" read in conjunction with the rest of the policy language—i.e., "physical loss"—requires that the " 'loss of use arises out of or as a result of the physical loss.' " Id. at 340 (quoting Seattle Tunnel Partners v. Great Lakes Reinsurance (UK), PLC, 18 Wn. App. 2d 600, 621, 492 P.3d 843 (2021)). "Thus, for coverage under the Policy, the loss of use of the insured property must be caused by *some physical condition* impacting the

15

insured property." Id. (emphasis added). The stoppage of the tunnel-boring machine did not satisfy that requirement.

In reaching this conclusion, the Seattle Tunnel Partners court discussed a variety of out-of-state cases[10] that highlighted a "loss of use claim is appropriate where the insured property is rendered unfit for its intended purpose or uninhabitable based on some change in the physical condition of the property." 200 Wn.2d at 342-43. All of these examples—such as gasoline pooled under the premises, asbestos and pesticide contamination, and the release of ammonia— required repair or remediation, and the courts found loss of use or functionality was a direct physical loss. Thus, the Seattle Tunnel Partners court reasoned, in loss of use cases, the loss "must be a result of or caused by some physical condition that impacts the property." Id. at 343.

Here, even taking the Complaint's allegations as true, the Tribes' Complaint still fails to account for how COVID-19 causes direct physical loss or damage to the insured property. The Tribes argue that COVID-19 adheres to property, turns it into a fomite, and renders it "unsafe for [its] intended purpose." As described above, a fomite is a term for "physical objects or materials that

---

[10] See, e.g., W. Fire Ins. Co. v. First Presbyterian Church, 165 Colo. 34, 437 P.2d 52 (1968) (finding coverage where the loss of use of the church was a direct result of an accumulation of gasoline that pooled under the premises; physical condition of the premises made it uninhabitable and a direct physical loss); Sentinel Mgmt. Co. v. New Hampshire Ins. Co., 563 N.W.2d 296 (Minn. Ct. App. 1997) (rejecting the insurer's argument that the property must suffer structural damage, concluding physical condition of the property, i.e., hazardous contamination by asbestos, rendered the property useless); Gen. Mills, Inc. v. Gold Medal Ins. Co., 622 N.W.2d 147, 152 (Minn. Ct. App. 2001) (insured could recover for loss of cereal product as a result of a pesticide contamination of its oats; oats suffered a direct physical loss because a pesticide contamination rendered them unfit for human consumption and "seriously impaired" insured property's (the oats') function and value); Gregory Packaging, Inc. v. Travelers Prop. Cas. Co. of Am., No. 2:12-CV-04418 (WHW) (CLW), 2014 WL 6675934 (D.N.J. Nov. 25, 2014) (finding coverage where an insured property, a packaging facility, suffered a release of ammonia that rendered the facility uninhabitable).

carry, and are capable of transmitting infectious agents, altering these objects to become vectors of disease." But the cited research also acknowledges both that COVID-19 can be cleaned and removed, and that while COVID-19 is persistent, the virus will dissipate on its own. At most, according to the Complaint, human coronaviruses can persist for up to 9 days.

The California Supreme Court recently addressed whether "the actual or potential presence of the COVID-19 virus on an insured's premises constitute[s] 'direct physical loss or damage to property' for purposes of coverage under a commercial property insurance policy?", a question certified to it by the Ninth Circuit. Another Planet Ent., LLC v. Vigilant Ins. Co., 15 Cal.5th 1106, 1117, 548 P.3d 303, 320 Cal. Rptr. 3d 843 (Cal. 2024). The court answered the question "no," specifically rejecting the same fomite theory and the air contamination theories posited here. Regarding fomites, the court distinguished physical damage to property from potential harm to humans:

> Describing an object as a fomite primarily reflects a conceptual or analytical change, not a physical one. And, to the extent the change is physical, it fails to satisfy the definition of direct physical damage to property for the same reason that other allegations of microscopic bonding or adhesion is insufficient. It does not involve damage or harm to property. 'Fomite-based transmission . . . typifies another way the virus "pos[es] health risk to humans," as opposed to property. [Citation.] Though this evidence shows that the COVID-19 virus is "harmful," it simply does not equate to evidence that any property suffered physical harm.' [Starr Surplus Lines Ins. Co. v. Eighth Jud. Dist. Ct. in & for County of Clark, 535 P.3d 254, 264-65 (Nev. 2023).]

Another Planet, 15 Cal.5th at 1149. Further, the court reasoned, "The mere fact of microscopic bonds between the virus and a surface says little about the effect of such microscopic bonds on that surface." Id. at 1148. Moreover, to the extent

17

the physical presence of the virus generally caused the property to be unusable, the property itself was not the source of harm. Id. at 1149. Rather, "[t]he continuing nature of the risk stems not from the property but from the presence of other humans." Id. at 1150. Thus, "the risk is 'untethered to any property.' " Id. (quoting United Talent Agency v. Vigilant Ins. Co., 77 Cal. App. 5th 821, 293 Cal. Rpt. 3d 65 (Cal. Ct. App. 2022)). We find the California Supreme Court's reasoning persuasive.[11]

The Tribes additionally plead that the remediation efforts in which they were forced to engage support coverage. They claim that "given the inadequacy of conventional cleaning procedures, disinfection and decontamination measures include[d], but [were] not limited to, the use of harsh chemicals to perform deep disinfection, the removal and disposal of porous materials like clothing, cloth, and other fabrics, and making changes to air filtration systems, and redesigning interior spaces, all performed at great cost and expense." According to the

---

[11] This analysis and conclusion are in alignment with courts in other jurisdictions that have addressed the theory that COVID-19 fomites physically alter property. For example, as the Nevada Supreme Court recently reasoned, "evidence that the virus remains harmful while in the air or as 'fomites' is . . . unconvincing because it does not demonstrate that the virus is harmful to the property." Starr Surplus Lines Ins. Co., 535 P.3d at 264. Indeed, "[t]hough this evidence shows that the COVID-19 virus is 'harmful,' it simply does not equate to evidence that any property suffered physical harm. Id. at 264-65. The Connecticut Supreme Court similarly held that "even if the plaintiffs had claimed that their properties were actually contaminated by the coronavirus, we find persuasive the cases that have held that the virus is not the type of physical contaminant that creates the risk of a direct physical loss because, once a contaminated surface is cleaned or simply left alone for a few days, it no longer poses any physical threats to occupants." Conn. Dermatology Grp., PC v. Twin City Fire Ins. Co., 288 A.3d 187, 203 (Conn. 2023). See also Or. Clinic, PC v. Fireman's Fund Ins. Co., 75 F.4th 1064, 1073 (9th Cir. 2023) (holding under Oregon law that plaintiff could not prove "direct physical loss or damage" when it pleaded COVID-19 particles infiltrated air systems and the only meaningful way to prevent constant reintroduction of the virus was through physically changing the office space, closing for periods of time, and limiting the use of the space). But see Huntington Ingalls Indus., Inc. v. Ace Am. Ins. Co., 287 A.3d 515, 536 (Vt. 2022) (holding the insured adequately alleged COVID-19 physically altered property in its shipyards when it adhered to the property's surfaces to survive a 12(c) motion to dismiss).

Complaint, "[v]entilation interventions" recommended by the Centers for Disease Control and Prevention and other remedial measures "to reduce the amount of the [COVID]-19 virus present in the space and to make property safe for its intended use" demonstrate that the virus "cause[d] direct physical loss, damage, or destruction to interior spaces by changing the physical conditions of property."

However, these remediation efforts do not trigger coverage for physical damage. The "Business Interruption" policy here still requires direct physical loss. It measures recovery based on a "period of restoration," which "begin[s] on the date direct physical loss occurs and interrupts normal business operations and ends on the date that the damaged property should have been repaired, rebuilt or replaced with due diligence and dispatch." The Tribes' remedial measures, such as disposal of fabric materials, changes to air filtration systems, social distancing, and regular cleaning, were not intended to "repair[], rebuil[d], or replace[]" the property; rather, they were intended to address the way people pose a harm to each other by carrying and transmitting the virus. As the California and Nevada Supreme Courts have reasoned regarding similar arguments,

> such alterations are neither caused directly by the presence of the virus itself nor do they remedy its physical effects on property. Instead, they are preventative; "they aim to redress the way people pose harm to one another by carrying and transmitting the virus at the property."

Another Planet, 15 Cal.5th at 1150 (quoting Starr Surplus, 535 P.3d at 265). See also Conn. Dermatology Grp., PC v. Twin City Fire Ins. Co., 288 A.3d 187, 203 (Conn. 2023) ("[P]laintiffs' activities designed to prevent the

19

transmission of the coronavirus on the properties were not 'repairs' in any ordinary sense of the word.").

Finally, the Tribes further contend COVID-19 virus "physically transformed the content of the air" at insured properties, "rendering the air unsafe for individuals to breathe." The Tribes rely on Graff v. Allstate Ins. Co., to support the contention that invisible but hazardous events that impact the air qualify as a "physical loss." 113 Wn. App. 799, 806, 54 P.3d 1266 (2002), rev. denied, 149 Wn.2d 1013 (2003).[12] In Graff, a landlord's rental home was rendered unusable after a tenant converted it into a methamphetamine lab. Id. at 801. Although Graff could not see any visible damage when the property was first returned to him, the property was declared "derelict" and unrentable by the City of Tacoma due to the hazardous vapors and residue released throughout the house. Id. To restore the property, Graff "replaced the carpet, painted, and hired an environmental firm to clean up the methamphetamine residue." Id. The court held this damage qualified as a covered physical loss. Id. at 806. It reasoned that although invisible, the "chemical release was measurable, even after it had contaminated the interior of the house." Id.

The Tribes' reliance on Graff is misplaced. In Graff, the policy covered "all risk of physical loss," including general vandalism and malicious mischief to the rental house, but excluded, among other things, contamination. Id. at 803. The issue was thus whether the loss was covered under a vandalism clause or

---

[12] The Tribes also rely on an Oregon case, which is not controlling here and was subsequently vacated. Or. Shakespeare Festival Ass'n v. Great Am. Ins. Co., No. 1:15-CV-01932-CL, 2016 WL 3267247 (D. Or. June 7, 2016), vacated by 2017 WL 1034203 (D. Or. Mar. 6, 2017).

excluded by the policy's contamination exclusion. Id. 800-01. Further, the methamphetamine vapors and residue created a permanent deprivation, i.e., inability to use the rental home, that could not be cured without remedial measures, and because of the type of contamination, the property became the source of the deprivation. Id. at 801. By contrast, here, the Tribes acknowledged the property still could be and was used, even if cleaning was required to remove the virus.

The Tribes also did not specify how the virus is harmful to its property while the virus is in the air. Instead, the Complaint focuses on the harm the aerosolized virus causes to *humans* or the ways in which humans continually reintroduce the virus, once again leaving the alleged harm untethered from direct physical loss or damage to the insured *property*. The Insurers respond that air is not property in the context of property policies, citing Tapestry, Inc. v. Factory Mut. Ins. Co., 286 A.3d 1044, 1059 (Md. 2022). Moreover, the Insurers emphasize that the Policies limit coverage to " 'real and/ or personal property'— neither of which can be reasonably interpreted to encompass air, which flows in and out of insured property, and exists all around."

We again find the reasoning of the court in Another Planet to be helpful and persuasive. In that case, the court rejected the air contamination argument, reasoning that even if it recognized air as property, the air is not contaminated due to direct physical loss or damage to the property, but rather continual reintroduction of the virus from people. 548 P.3d at 330 n.8. We likewise reject

21

the Tribes' air contamination theory, as the presence of the virus and/or fomites in the air does not constitute direct physical loss or damage to its property.[13]

In addition to the claim for coverage under the Business Interruption policy, the Tribes additionally claim coverage under other provisions, including those providing coverage for Extra Expense, Ingress/Egress, and Interruption by Civil Authority. The Tribes also alleged extracontractual claims of violation of the common law duty of good faith and fair dealing, the CPA, and IFCA. But the Tribes acknowledge that "physical loss or damage" is necessary to all of the Tribes' claims for coverage under these additional provisions and, likewise, that their extracontractual claims "turn on whether the Insurers properly denied the Tribes' insurance claims." Given our conclusion that COVID-19 does not cause physical loss or damage, we also affirm dismissal of the additional coverage and extracontractual claims.

CONCLUSION

We affirm the trial court's orders granting the Respondents' CR 12(b)(6) motions and dismissing all claims.

---

[13] The Insurers also argue the Tribes cannot show the presence of the virus at any particular property caused their losses. Because we conclude COVID-19 as a matter of law does not cause "direct physical loss or damage," we do not address the Insurers' causation argument.

_Chung, J._

WE CONCUR:

_Coburn, J._                    _Mann, J._